326 U.S. 60 (1945)
INTERSTATE COMMERCE COMMISSION ET AL.
v.
PARKER, DOING BUSINESS AS PARKER MOTOR FREIGHT, ET AL.
No. 507.
Supreme Court of United States.
Argued March 28, 1945.
Decided June 18, 1945.
APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF INDIANA.[*]
*61 Mr. Daniel H. Kunkel, with whom Mr. Daniel W. Knowlton was on the brief, for the Interstate Commerce Commission; and Mr. John Dickinson, with whom Messrs. Harry E. Yockey, H.Z. Maxwell, John B. Prizer, Sterling G. McNees and R. Aubrey Bogley were on the brief, for the Willett Company et al., appellants in No. 507.
Mr. Kit F. Clardy, with whom Mr. Howell Ellis was on the brief, for Parker et al.; Mr. Fred I. King, with whom *62 Mr. Clair McTurnan was on the brief, for the Norwalk Truck Line Co.; and Mr. Claude H. Anderson entered an appearance for Days Transfer, Inc. et al., appellees.
MR. JUSTICE REED delivered the opinion of the Court.
These appeals bring here for review a final judgment of the Special District Court which enjoined the enforcement of an order of the Interstate Commerce Commission. The proceedings below and the appeals here were brought under 28 U.S.C. § 41 (28), §§ 43-48 and § 345. The report of the Commission appears under the title Willett Co. of Ind., Inc., Extension  Fort Wayne-Mackinaw City, 42 M.C.C. 721. The district court did not file an opinion.
The applicant, the Willett Company, is a wholly owned, common carrier by motor, subsidiary of the Pennsylvania Railroad Company. Previous to this application it held motor carrier operating rights for some twenty-five routes which paralleled lines of the Pennsylvania Railroad at other points than those covered by this application. Fort Wayne was included. Willett sought to secure from the Commission in this case certificates of convenience and necessity for seven additional routes extending along the lines of the Pennsylvania Railroad between Fort Wayne, Indiana, and Mackinaw City, Michigan.
The applications were granted after findings that Willett would render service auxiliary to and supplemental of the Pennsylvania's service in the transportation of less-than-carload freight. The service is to be rendered on railroad billings and is to employ railroad fixed and clerical facilities. The Commission found that Willett's service would be coordinated with the rail service and under railroad supervision. 42 M.C.C. 725; 21 M.C.C. at 407. It also found that the present and future public convenience and necessity required those motor carrier operations.
In accordance with the policy of the Commission in granting certificates to railroad motor carrier affiliates *63 to improve the service of the railroad, the Commission limited the carrier to service which is auxiliary to or supplemental of the rail service of the Pennsylvania. It forbade service to "any point not a station on a rail line of the railroad," and took steps to keep the Commission informed of the contractual arrangements between Willett and the Pennsylvania.
While the routes paralleled the lines of the Pennsylvania in northern Indiana and the southern peninsula of Michigan, the authorization to Willett forbade the transportation by applicant as a common carrier of any shipments from Fort Wayne, Indiana, to Grand Rapids, Michigan, or through or to or from more than one of said points. The purpose of this limitation was to restrict Willett to transportation truly supplemental or auxiliary to the rail traffic. The two cities are break-bulk or key points. Less-than-carload freight comes to or leaves them in carload lots. When a mixed carload reaches one of these key points, the contents are distributed to the smaller, intermediate points of destination as way-freight by "peddler" cars. The Willett Company seeks to take over this "peddler" work and not to do over-the-road trucking. Such motor-rail coordination has proven successful in improving service and reducing carrier costs.
As a further assurance that Willett might not inadvertently have received privileges beyond the Commission's intention to grant, a right was reserved by the Commission to impose such further specific conditions as it might find necessary in the future to restrict Willett's operation "to service which is auxiliary to, or supplemental of, rail service."
The operation of the order of the Commission was enjoined by the district court because there was no substantial evidence to support the order of the Commission that public convenience and necessity required the issuance of a certificate to Willett. The district court said in the findings *64 of fact that there was no proof that the present highway, common motor carrier transportation service by certificated carriers was or would be inadequate to serve the public need. The appellants, of course, contest here the soundness of the district court judgment.
The Interstate Commerce Commission insists that its order authorizing the issuance to Willett of the certificates of convenience and necessity for the specified routes is valid. It bases its contention on the statutory provisions which authorize the Commission to act in regulation of motor carriers and asserts its compliance with them. Under the Interstate Commerce Act, part II, § 206 (a), 49 Stat. 551, no motor vehicle subject to the act may operate on the highways without a certificate of public convenience and necessity. Section 207 (a) provides for issuance of the certificate on application, if the proposed service "is or will be required by the present or future public convenience and necessity." No other provisions are here involved. The entire subsection appears below.[1] A finding of public convenience and necessity was made, 42 M.C.C. at 726, but that ultimate finding must have been based on the proper statutory criteria and must have had the necessary factual findings to support it.
*65 Public convenience and necessity is not defined by the statute. The nouns in the phrase possess connotations which have evolved from the half-century experience of government in the regulation of transportation. When Congress in 1935 amended the Interstate Commerce Act by adding the Motor Carrier Act, it chose the same words to state the condition for new motor lines which had been employed for similar purposes for railroads in the same act since the Transportation Act of 1920, § 402 (18) and (20), 41 Stat. 477. Such use indicated a continuation of the administrative and judicial interpretation of the language. Cf. Case v. Los Angeles Lumber Co., 308 U.S. 106, 115. The Commission had assumed, as its duty under these earlier subsections, the finding of facts and the exercise of its judgment to determine public convenience and necessity. This Court approved this construction. Chesapeake & Ohio R. Co. v. United States, 283 U.S. 35, 42. Cf. Gray v. Powell, 314 U.S. 402, 411-12. The purpose of Congress was to leave to the Commission authoritatively to decide whether additional motor service would serve public convenience and necessity. Cf. Powell v. United States, 300 U.S. 276, 287. This, of course, gives administrative discretion to the Commission, cf. McLean Trucking Co. v. United States, 321 U.S. 67, 87-88, to draw its conclusion from the infinite variety of circumstances which may occur in specific instances. The disputants, here, do not clash over the power of the Commission to determine the need for the new service or that it will serve the public convenience and necessity. The evidence is ample and uncontradicted that delivery by motor of less-than-carload freight to way stations is a more adequate, efficient and economical method for railroads than by "peddler" car. They join issue on the Commission's determination as to the carrier which will render that service. Shall it be by the railroad through the use of its trucking subsidiary or by the existing common carriers by motor?
*66 The National Transportation Policy has recently been authoritatively summarized by Congress. That declaration requires administration so as to preserve the inherent advantages of each method of transportation and to promote "safe, adequate, economical, and efficient service."[2] Such broad generalizations, while well expressing the Congressional purpose, must frequently produce overlapping aims. In such situations, the solution lies in the balancing by the Commission of the public interests in the different types of carriers with due regard to the declared purposes of Congress. Cf. I.C.C. v. Inland Waterways Corp., 319 U.S. 671, 691; United States v. Pennsylvania R. Co., 323 U.S. 612, 615.
When Congress directed that the act should be administered to preserve the inherent advantages of each mode of transportation, it is abundantly clear that it was not intended to bar railroads from the operation of off-the-rail motor vehicles. In 1938 when committee hearings were being held to consider amendments to the Motor Carrier Act, 1935, Mr. Eastman explained the difference in opinion *67 as to whether or not railroads should acquire motor carriers.[3] Section 213 (a) of the 1935 act specifically regulated acquisition of motor carriers by railroads. Provision for such acquisitions appear now in § 5 of the Interstate Commerce Act, 54 Stat. 905. See McLean Trucking Co. v. United States, supra. Section 202 (c) (1) of the 1940 Interstate Commerce Act, part II, as amended, withdraws railroad operation of motor carriers in terminal areas from the scope of motor carrier regulation and leaves such operations under part I.[4] Railroads may, therefore, *68 in appropriate places operate trucks. However, since the preservation of the inherent advantages of motor carriers is of equal importance with efficiency under the national transportation policy, the Commission must weigh the needs of the railroad against disadvantages to the motor carriers to find the balance of public convenience and necessity in determining whether to grant a railroad application for motor operation where these certificates are required. Cf. Texas v. United States, 292 U.S. 522, 530.
This the Commission did in its findings and conclusion. It said:
"The motor-carrier service proposed by applicant, operated in close coordination with the railroad's service, will effectuate a reduction in cost, and will result in an increase in efficiency in the transportation over the routes herein considered, which will inure to the benefit of the general public. Furthermore, it does not appear that the restricted service would be directly competitive or unduly prejudicial to the operations of any other motor carrier. . . ." 42 M.C.C. at 726.
In support of this statement the evidence showed that Willett served, similarly and satisfactorily, other localities along the Pennsylvania lines in Ohio, Indiana and Illinois. The coordination of Willett's line-haul method of operations with the rail service has been explained. The existing schedules of protestants do not fit into the needs of the projected service. Common management of railroad *69 and trucks gave promise of better cooperation than would be obtained by arm's-length contracts or agreements. While the evidence shows that there were operating truck lines in the area which individually could serve all the waystations by securing extensions to their present routes, it also shows that no motor carrier is now in a position to render this complete service. Cf. Kansas City Southern Transport Co., Common Carrier Application, 10 M.C.C. 221, 232. The Commission on this evidence had a basis to conclude that a railroad subsidiary offered the most satisfactory facilities for making less-than-carload deliveries to way-stations.
The contention of appellees, protestant motor carriers, is that since no evidence was offered as to the inadequacy of the presently duly certificated motor carriers to serve the railroad's need, there was a failure of proof as to convenience of and necessity for a new motor truck operation in the territory. Public convenience and necessity should be interpreted so as to secure for the Nation the broad aims of the Interstate Commerce Act of 1940. Cf. New England Divisions Case, 261 U.S. 184, 189; I.C.C. v. Railway Labor Assn., 315 U.S. 373, 376-77; United States v. Lowden, 308 U.S. 225, 230; Texas & N.O.R. Co. v. Northside Belt R. Co., 276 U.S. 475, 479. In protestants' view a certificate of convenience and necessity should not be granted to railroads for motor truck operation when existing motor carriers are capable of rendering the same service. Appellants take the position that this precise issue need not be decided in this case. They look upon the application as asking for authority to improve "an existing service." We think that it was for a motor service to improve an existing rail service. Consequently, the issuance of the certificate is subject to all the requirements of any other application for a certificate for operation of motor lines. Since, however, on adequate evidence the Commission found that the motor service sought was of a different character from the existing motor service and not directly *70 competitive or unduly prejudicial to the already certificated motor carriers, 42 M.C.C. 725-26, we hold that the Commission had statutory authority and administrative discretion to order the certificate to issue. The public is entitled to the benefits of improved transportation. Where that improvement depends in the Commission's judgment upon a unified and limited rail-truck operation which is found not "unduly prejudicial" to motor carrier operations, the Commission may authorize the certificate even though the existing carriers might arrange to furnish successfully the projected service.
Certificates of the general character of the one proposed by the Commission for Willett have been granted heretofore.[5] The motor service was not the normal over-the-road type but restricted to services auxiliary or supplemental to the rail service. In order to restrict motor carriers which were operated by railroads to this coordinated service, the Commission customarily inserted a provision in the order granting the application that the motor shipments must have prior or subsequent movement by rail. E.g. Kansas City Southern Transport Co., Common Carrier Application, 10 M.C.C. 221, 240. The rail carriers pointed out, however, that this restriction interfered with the efficiency of their operations, since commodities might be offered them at one way-station for transportation to another way-station within ordinary motoring distance. In such a case a way-freight train would be required. It was to *71 meet this situation that the key-point or break-bulk rule, which is employed here, was developed. Kansas City Southern Transport Co., Common Carrier Application, 28 M.C.C. 5, 9, 11, 22 (par. 3), 25 (App. B).
This key-point requirement is one factor of differentiation between this certificate and the normal over-the-road motor certificate of convenience and necessity. Other differentiations are found in the limitation of service to rail station points and the condition that the Commission reserved the right to impose such other requirements as might be found necessary to restrict the rail subsidiary to coordinated rail service instead of permitting general competition with motor carriers in over-the-road service.
It is, of course, obvious that opportunity exists for limited encroachment upon the over-the-road business of the existing motor carriers. A shipper from one way-station to another station on the same railroad within the permitted key-point limitation may use the railroad motor carrier instead of the motor carrier. Free pickup and delivery service may extend the competition to the limits of the territorial boundaries of the railroad terminal areas and give a further advantage to the railroad where the motor carrier does not furnish the same service.[6] If the *72 Commission later determines that the balance of public convenience and necessity shifts through competition or otherwise, so that injury to the public from impairment of the inherent advantages of motor transportation exceeds the advantage to the public of efficient rail transportation, the Commission may correct the tendency by restoration of the rail movement requirement or otherwise.
Administrative discretion rests with the Commission to further improvements in transportation. The Interstate Commerce Act contains no provision by which the Commission may compel non-rail motor carriers to coordinate their road service with rail service or may compel rail carriers to coordinate their service with motor carriers.[7] When in railroad applications for coordinated motor service the Commission finds public convenience and necessity for such motor service on evidence of transportation advantages to shippers and economy to the rail carriers, cf. Texas v. United States, 292 U.S. 522, 530, it is in a position to determine by its administrative discretion whether the *73 projected service may be better rendered by the railroad or existing motor carriers. In the absence of power to compel coordination between the modes of transportation and in the presence of the probable gains in operative efficiency from unified management, we think the Commission, in view of the limitations on the railroad's motor service, is entitled to conclude that the public will be better served by the rail operation than by use of the available motor carrier facilities. The alternative to the existence of this discretion is that the language of the Interstate Commerce Act, part II, forbids the granting to railroads of a certificate of convenience and necessity for the operation of motor trucks, under specially limited certificates, when there are certificated motor carriers, independent of railroad authority or supervision, with whom arrangements for the service might be made by the rail carriers. There is no such prohibition in terms. Any such implication is negated by the discretion to grant certificates conferred on the Commission by the Act.
Protestants, the appellee motor carriers, point out that under this interpretation in every case of an application by a rail carrier or its wholly owned subsidiary, for a certificate of convenience and necessity to operate a motor line to render service at way-stations, the Commission will have power, under facts and with limitations in the certificate, previously described, to grant the certificate. This is true. It must be expected, however, that the Commission will be as alert to perform its duty in protecting the public in the maintenance of an efficient motor transportation system as it is in protecting that same public in the successful operation of its rail system. The Commission is trusted by Congress to guard against the danger of the development of a transportation monopoly. 49 U.S.C. § 5 (2) (a) and (b). It has the duty to preserve the inherent advantages of each mode of transportation.
Appellees raise here an objection to the failure of the Commission to reopen the case to hear evidence on the *74 bias of the railroad witnesses. No valid reason for failure to bring out the alleged bias at the trial is suggested.
We pass also without further discussion the appellees' complaint of material error in the refusal to produce the contract between the Pennsylvania and Willett at the hearing. It does not seem material in view of our conclusions. The Joint Board directed that the contract be filed as a "late exhibit."
Reversed.
MR. JUSTICE DOUGLAS, dissenting.

I
Sec. 207 (a) of the Interstate Commerce Act authorizes the issuance of a certificate to a common carrier by motor vehicle if the proposed service "is or will be required by the present or future public convenience and necessity." But the present decision allows the Commission to construe the statute as if "railroad convenience and necessity" rather than "public convenience and necessity" were the standard.
I can find in the Act no indication whatsoever that railroad applicants for a motor vehicle certificate are to be considered any more favorably than any other type of applicant. Yet it is plain that this decision permits just that. For if any applicant other than a railroad affiliate were before the Commission with an application for a certificate to serve this precise territory, it would have to show that existing transportation facilities were inadequate to serve the needs of the public efficiently.[1] No such showing has been made here. None has been attempted.
*75 That necessity is sought to be avoided by holding that the motor carrier service to be rendered is "auxiliary to or supplemental of rail service." If, as the Commission at first required (Kansas City Southern Transport Co., 10 M.C.C. 221), this motor carrier service was restricted to goods which had a prior or subsequent rail haul, the service might properly be designated as an auxiliary or supplemental one. But the Commission changed its position and withdrew that condition. Kansas City Southern Transport Co., 28 M.C.C. 5. The key-point condition was substituted. Between those points the railroad will operate like any motor carrier. The service which it seeks to render is not a combined rail-and-truck service. As the Commission states in its report in the present case, "The railroad, through its subsidiary, merely seeks the substitution of a more efficient for a less efficient means of service." This "substituted" service differs from the adequate independent motor carrier service already existing only in its being under railroad control. In that respect and in that respect alone is the service of a new and different character.
The Commission justifies that "substitution" of service on the grounds of the operating convenience of the railroad and a reduction in its costs. That is a standard of "railroad" not "public" convenience. Would it be thought for a moment that motor carriers could obtain authority to build a new competing railroad by any such standard of "motor carrier" convenience?
Whether it is wise policy for the railroads to enter and dominate this field is neither for us nor the Commission to decide. If the railroads are to be given this preferred treatment when they seek to substitute motor carrier service for rail service, the authority should come from Congress, not this Court. Meanwhile, we should be alert to see to it that administrative discretion does not become the vehicle for reshaping the laws which Congress writes.

*76 II
If the railroad company was acquiring an existing motor carrier to render this service, the Commission could approve the acquisition only if it found, among other things, that the acquisition would "not unduly restrain competition." 49 U.S.C. § 5 (2) (b). See McLean Trucking Co. v. United States, 321 U.S. 67. This provision was inserted so as to protect the motor carrier industry from the domination of other types of carriers which "might use the control as a means to strangle, curtail, or hinder progress in highway transportation for the benefit of the other competing transportation." 79 Cong. Rec. 12206.
The same standard should be applied whether the railroads enter the motor carrier field by acquisition of existing facilities or by establishment of their own motor carrier affiliates. The potentialities for abuse may be as great in one case as in the other. Railroads, like other business enterprises, are subject to the anti-trust laws except as Congress has created exemptions for them. Georgia v. Pennsylvania R. Co., 324 U.S. 439. And the anti-trust policy is one of the components of the public interest which the Commission is supposed to protect in the transportation field. McLean Trucking Co. v. United States, supra.
The preservation of healthy competitive conditions must therefore be an ingredient of "public convenience and necessity" which the Commission is under the duty to determine in issuing certificates under § 207 (a). Certainly the effect on competition looms large when one type of carrier seeks to enter another field of transportation. The Commission paid lip-service to that policy when it said in the present case that the restricted service to be rendered by this railroad affiliate would not appear to be "directly competitive or unduly prejudicial to the operations of any other motor carrier." But where is the evidence to support that finding? I do not find it. It is suggested *77 that there can be no competition because the railroad now has the business. But the railroad is not restricted to business which it now has. Between the key-points it is entitled to any and all business which it can get. Every future movement of freight will be the subject of competition. If, as assumed, the present railroad service is poor as compared with the proposed new motor carrier service, a new and important competitive element will certainly be introduced. The railroad wants this broad certificate so it can better compete with existing motor carriers. If the railroad really wants a purely auxiliary service, let the certificate be limited to commodities which have a prior or subsequent rail haul. But it is not so conditioned. The railroad is entering the motor carrier field and rendering a pure motor carrier service. If the policy of Congress is to be honored, there must be a finding supported by evidence that competition will not be unduly restrained. On this record no such finding has been or can be made.
MR. JUSTICE BLACK and MR. JUSTICE RUTLEDGE join in this dissent.
NOTES
[*] Together with No. 508, United States v. Parker, doing business as Parker Motor Freight, et al., also on appeal from the District Court of the United States for the Southern District of Indiana.
[1] 49 Stat. 551-52:

"Sec. 207. (a) Subject to section 210, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operations covered by the application, if it is found that the applicant is fit, willing, and able properly to perform the service proposed and to conform to the provisions of this part and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, to the extent to be authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied: Provided, however, That no such certificate shall be issued to any common carrier of passengers by motor vehicle for operations over other than a regular route or routes, and between fixed termini, except as such carriers may be authorized to engage in special or charter operations."
[2] 54 Stat. 899:

"It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;  all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy."
[3] Hearings before a subcommittee of the Committee on Interstate Commerce, United States Senate, 75th Cong., 3d Sess., on S. 3606, p. 23:

"The reason for that proviso was that at the time when this act was under consideration by your committee, there was a feeling on the part of many that railroads, for example, ought not be permitted to acquire motor carriers at all. It was pointed out, in opposition to that view, that there were many cases where railroads could use motor vehicles to great advantage in their operations, in substitution for rail service, as many of them are now doing. Many railroad men, for example, feel that the operation of way trains has become obsolete; that the motor vehicle can handle such traffic between small stations much more economically and conveniently than can be done by a way train; and the motor vehicles are being used in that way by many railroads. The same is true of many terminal operations. The motor vehicle is a much more flexible unit than a locomotive switching cars, and it can be used to great advantage and with great economy in many railroad operations.
"For that reason, something of a compromise was reached between those two opposing views, and it was provided that a railroad could acquire a motor carrier if it could make special proof that the transaction was not only consistent with the public interest but would promote the public interest and would also promote the public interest in a special way, namely, by enabling such carrier other than a motor carrier to use service by motor vehicle to public advantage in its operations. And a further finding was required, that the acquisition will not unduly restrain competition."
[4] 56 Stat. 300, § 2:

"(c) Notwithstanding any provision of this section or of section 203, the provisions of this part . . . shall not apply 
"(1) to transportation by motor vehicle by a carrier by railroad subject to part I, or by a water carrier subject to part III, or by a freight forwarder subject to part IV, incidental to transportation or service subject to such parts, in the performance within terminal areas of transfer, collection, or delivery services; but such transportation shall be considered to be and shall be regulated as transportation subject to part I when performed by such carrier by railroad, as transportation subject to part III when performed by such water carrier, and as transportation or service subject to part IV when performed by such freight forwarder . . ."
See Conference Report, H. Rep. No. 2832, 76th Cong., 3d Sess., § 17 (B), p. 74.
[5] Pennsylvania Truck Lines  Control  Barker, 1 M.C.C. 101, 113; 5 M.C.C. 9. Similar finding was made in Illinois Central R. Co., Common Carrier Application, 12 M.C.C. 485; Gulf, M. & N.R. Co., Common Carrier Application, 18 M.C.C. 721; Missouri Pacific R. Co., Extension of Operations  Illinois, 19 M.C.C. 605; Willett Co. of Ind., Extension  Ill., Ind. and Ky., 21 M.C.C. 405; Pacific Motor Trucking Co., Common Carrier Application, 34 M.C.C. 249, 322, par. 4.

The Commission's brief, Appendix B, lists 94 opinions dealing with truck movement of rail freight.
[6] I.C.C. Local Freight Tariff, Rules, Charges and Allowances for the Pick-Up and Delivery Service on Less Than Carload Freight, Issued January 2, 1942, effective February 6, 1942, p. 9:

"Item No. 30. Territorial Boundaries. (a) Except as otherwise specifically indicated in Section 2, Pick-up or Delivery service will be confined within the corporate limits of cities or towns; at points not having corporate limits, within a radius of one mile of carrier's freight station."
See also Pick-up and Delivery in Official Territory, 218 I.C.C. 441, 445; dissent, 483-84; Pick-up of Livestock in Illinois, Iowa and Wisconsin, 238 I.C.C. 671; 248 I.C.C. 385, 391, 397; 251 I.C.C. 549; Morgain Forwarding Co., Pick-up and Storage, 258 I.C.C. 547, 771; Empire Carpet Corp. v. Boston & M.R. Co., 258 I.C.C. 697. Also see, § 202 (c) of part II, Interstate Commerce Act, 54 Stat. 920, 56 Stat. 300.
[7] 10 M.C.C. 235-36:

"We are without jurisdiction to compel coordinated service between carriers by rail and carriers by motor vehicle. It could only be accomplished through the medium of through routes and joint rates and we have no power to require their establishment. It follows that any such plan must be dependent on voluntary cooperation. While protestants say that they are willing to entertain proposals, they have not developed a plan nor do they suggest what general form it might take.
.....
"Upon the evidence, therefore, we are persuaded that coordinated service through the voluntary cooperation of all or some of the protesting motor carriers is not here practicable, and that the `useful public purpose' which the proposed new operation will serve cannot `be served as well by existing lines or carriers.' It remains to be determined whether, in accordance with the definition of `public convenience and necessity' in the Pan-American case, [1 M.C.C. 190], `it can be served by applicant with the new operation or service proposed without endangering or impairing the operations of existing carriers contrary to the public interest.'"
[1] Norton, Common Carrier Application, 1 M.C.C. 114; C & D Oil Co., Contract Carrier Application, 1 M.C.C. 329; Carr, Contract Carrier Application, 2 M.C.C. 263, 269; Irven G. Saar, Common Carrier Application, 2 M.C.C. 729; Merrill & Hamel, Common Carrier Application, 8 M.C.C. 115, 117; Boyles & Luten, Common Carrier Application, 8 M.C.C. 593; White Circle Line, Common Carrier Application, 16 M.C.C. 516.