**CANTLAY & TANZOLA, Inc. et al.**
**v. UNITED STATES et al.**
No. 15166.

United States District Court,
S. D. California, C. D.
Sept. 24, 1953.

Edward M. Berol, Bertram S. Silver and Marvin Handler, San Francisco, Cal., for plaintiffs Cantley & Tanzola, Inc., and others.

Stevenson & Richman, Los Angeles, Cal., for International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers,—American Federation of Labor, Local Unions Nos. 104, 310, and 224.

Marvin Handler, San Francisco, Cal., for intervening plaintiffs Whitfield Transportation, Inc. and E. B. Law and Son, Inc.

Frederick G. Pfrommer, Robert L. Pierce, Chas. W. Burkett, Jr., San Francisco, Cal., C. W. Cornell, E. L. H. Bissinger, Walt A. Steiger, Los Angeles, Cal., and J. E. Lyons, San Francisco, Cal., for defendants Southern Pacific Co. and others.

Edward M. Reidy, Chief Counsel, Allen Crenshaw, Assoc. Chief Counsel, Ellis V. Gregory, Washington, D. C., William L. Harrison, San Francisco, Cal., for intervening defendant Interstate Commerce Commission.

Laughlin E. Waters, U. S. Atty., Los Angeles, Cal., Edward P. Hodges, Acting Asst. Atty. Gen., E. Riggs McConnell, James E. Kilday, William J. Hickley, Sp. Assts. to the Atty. Gen., Washington, D. C., Max F. Deutz, Asst. U. S. Atty., Los Angeles, Cal., for the United States.

Before STEPHENS, Circuit Judge, and MATHES and JAMES M. CARTER, District Judges.

MATHES, District Judge.

Certain tank-truck motor carriers of bulk petroleum products, joined by various locals of International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers, seek by this action to enjoin and annul an order of the In-

terstate Commerce Commission entered January 12, 1953 in proceeding entitled. *"Investigation and Suspension Docket No. 6010—Petroleum, Los Angeles and El Paso to Arizona and New Mexico."* See 287 I.C.C. 731 (1953).

Jurisdiction of this court is invoked under 28 U.S.C. § 1336. See also: Id. §§ 2321–2325, 2284; 49 U.S.C.A. § 17 (9); 5 U.S.C.A. § 1009; Am. Trucking Ass'ns v. United States, 1953, 344 U.S. 298, 318–320, 73 S.Ct. 307; United States v. L. A. Tucker Truck Lines, 1952, 344 U.S. 33, 73 S.Ct. 67.

In the language of the Commission: "By schedules filed to become effective on June 9, 1952, the respondents [rail carriers] proposed reduced rates on refined petroleum products and distillate fuel oils, in tank-car loads, from Los Angeles, Calif. * * * shipping points, and El Paso, Tex., to Phoenix and Tucson, Ariz., and intermediate and related points in Arizona and New Mexico." Petroleum, Los Angeles and El Paso to Arizona and New Mexico, supra, 287 I.C.C. at 731; see 49 U.S.C.A. § 6.

Following protest by plaintiff tank-truck carriers and others, the Commission entered upon a hearing concerning the lawfulness of the proposed rates, pursuant to 49 U.S.C.A. § 15(7) which provides that:

"Whenever there shall be filed with the commission any schedule stating a * * * rate, * * * the commission shall have * * * authority * * * upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate * * * and pending such hearing and the decision thereon the commission, upon filing with such schedule and delivering to the carrier or carriers affected thereby a statement in writing of its reasons for such suspension, may from time to time suspend the operation of such schedule and defer the use of such rate * * * but not for a longer period than seven months beyond the time when it would otherwise go into effect * * *. At any

hearing involving a change in a rate * * * the burden of proof shall be upon the carrier to show that the proposed changed rate * * * is just and reasonable * * *."

The Commission on June 6, 1952 ordered operation of the schedules suspended until January 9, 1953—for the entire seven-months' period permitted by law. 49 U.S.C.A. § 15(7). It later appeared that the Commission would not reach decision prior to expiration of this suspension period, and the rail carriers voluntarily further postponed the effective date of the proposed reduced rates until February 8, 1953.

Meantime hearing was had before an examiner, 49 U.S.C.A. § 17(10), who recommended to the Commission a finding that "the proposed rates under the circumstances are shown to be not unreasonable or otherwise unlawful." Exceptions were filed to the report of the examiner and, upon application of the parties, the Commission sat *en banc* on December 18, 1952 to hear oral argument in the matter.

The Commission divided sharply in reaching a decision. Six of the eleven members joined in a report declaring: "We find that the proposed schedules are just and reasonable, and are not shown to be unlawful"; and accordingly on January 12, 1953 directed entry of the challenged order that the proceeding be discontinued. The other five Commissioners, including the Chairman, dissented; three joined in a dissenting report. 287 I.C.C. at 737; id. at 737–739.

Various petitions for reconsideration and for leave to intervene thereafter filed were denied on April 6, 1953. 49 U.S.C.A. § 17(6–9).

After petitioning for reconsideration by the Commission of the majority report and order of January 12, 1953, plaintiff tank-truck carriers learned shortly prior to February 4, 1953 that defendant rail carriers had requested the Commission's permission, thereafter granted, to advance the effective date of the reduced rates, then under voluntary

suspension, from February 8 to February 5, 1953. See 49 U.S.C.A. § 6(3).

The Commission having refused to suspend its order of January 12, 1953, 49 U.S.C.A. § 16(6), plaintiffs on February 4, 1953 filed this action in the United States District Court for the Northern District of California. The court that day issued a temporary restraining order enjoining the rail carriers "from publishing or making effective rates lower than those in effect on January 12, 1953, for the transportation of petroleum products in tank cars from the Los Angeles, California, area, and from El Paso, Texas, to points in Arizona * * *"; and enjoining the Commission "from carrying into effect the terms and conditions of said order * * * dated January 12, 1953 *· * *." Cf. I. C. C. v. Mechling, 1947, 330 U.S. 567, 573–574, note 6, 67 S.Ct. 894, 91 L.Ed. 1102.

It was thereafter shown that venue was not properly laid in the Northern District, 28 U.S.C. § 1398, and on February 12, 1953 that court ordered the case transferred here. 28 U.S.C. § 1406 (a).

Defendant rail carriers promptly moved to dissolve the temporary restraining order upon the ground, *inter alia,* that because plaintiffs had filed a petition for reconsideration, not then acted upon by the Commission, they had not as yet exhausted their administrative remedies; and upon the further ground that, shortly prior to notice of the temporary restraining order, the rail carriers had mailed to the Commission a tariff supplement covering the lower rates in controversy, "which tariff supplement was delivered to said Commission * * * on February 4, 1953 * * * and thereupon filed, and * * * became effective by its terms on February 5, 1953." See 49 U.S.C.A. § 6(3, 7).

■ As to the ground first stated the danger of immediate and irreparable injury to plaintiffs, had they awaited action of the Commission on their petition for reconsideration, was sufficiently clear to warrant judicial intervention in advance of final administrative action, by way of exception to "the long-settled rule of judicial administration [see Eccles v. Peoples Bank, 1948, 333 U.S. 426, 434, 68 S.Ct. 641, 92 L.Ed. 784] that no one is entitled to judicial relief for a * * * threatened injury until the prescribed administrative remedy has been exhausted." Myers v. Bethlehem Shipbuilding Corp., 1938, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638; cf. United States v. Illinois Cent. R. Co., 1934, 291 U.S. 457, 463, 54 S.Ct. 471, 78 L.Ed. 909; Delaware & Hudson Co. v. United States, 1925, 266 U.S. 438, 448–449, 45 S.Ct. 153, 69 L.Ed. 369.

■ As to other grounds urged in support of the motion to dissolve, it having appeared without dispute that defendant rail carriers did not at any time prior to the presentation of the motion take any steps to comply with the provisions of the temporary restraining order sought to be dissolved, United States v. United Mine Workers, 1947, 330 U.S. 258, 290–294, 67 S.Ct. 677, 91 L.Ed. 884; United States v. Shipp, 1906, 203 U.S. 563, 573, 27 S.Ct. 165, 51 L.Ed. 319, they were held "precluded from applying for any order of any kind" in this action until after they should have made every reasonable effort to comply. See: Hovey v. Elliott, 1897, 167 U.S. 409, 428, 436, 440, 17 S.Ct. 841, 42 L.Ed. 215; Early v. Early, 1919, 49 App.D.C. 123, 261 F. 1003, 1004; Exploration etc. Co. v. Pacific Hdw. etc. Co., 9 Cir., 1910, 177 F. 825, 834; Wartman v. Wartman, C.C. D.Md.1853, 29 Fed.Cas., pages 303, 305, No. 17,210; Houston etc. Freight Lines v. Local No. 745, D.C.N.D.Tex.1939, 27 F.Supp. 262, 265; Weeks v. Superior Court, 1922, 187 Cal. 620, 203 P. 93; Soderberg v. Soderberg, 1923, 63 Cal. App. 492, 219 P. 82; Campbell v. Justices of Superior Court, 1905, 187 Mass. 509, 73 N.E. 659, 69 L.R.A. 311; Michel v. O'Brien, 1894, 6 Misc. 408, 27 N.Y.S. 173.

Accordingly the motion to dissolve was dismissed and the temporary restraining order continued in force pending

hearing and determination of plaintiffs' application for an interlocutory injunction. 28 U.S.C. § 2325. The rail-carrier defendants thereafter requested and obtained authority from the Commission to restore the *status quo ante*, and on April 18, 1953 restored the higher rates which prevailed before February 5, 1953. See 49 U.S.C.A. § 6(3).

Meantime this court heard and submitted plaintiffs' application for an interlocutory injunction and set the case for trial. Upon the trial, the entire record of the proceeding before the Commission was received in evidence, and the case was then argued and submitted for decision.

In the language of the majority report, 287 I.C.C. at 731–737, the material facts are briefly: "The Texas Company, sometimes referred to as Texaco, operates a petroleum oil refinery at El Paso and another at Wilmington, [Los Angeles County] Calif., from which it now ships refined petroleum products to its bulk distributing stations in this territory. Crude oil is delivered to its refineries by a pipe line extending from west Texas producing fields. An additional crude-oil pipe line is now under construction from those oil fields to El Paso, which will increase the pipe-line capacity from 28,500 to 42,000 barrels per day. Some time in 1951, Texaco indicated its intention to enlarge its El Paso refinery and * * * to construct a pipe line for refined products westward from El Paso to Tucson and Phoenix. The refined products would be distributed throughout Arizona from terminals at Tucson and Phoenix.

"The Standard Oil Company of California, herein called Standard, owns and operates large oil refineries at El Paso and El Segundo, [Los Angeles County] Calif. Standard is enlarging the capacity of its El Paso refinery from 17,000 barrels to 25,000 barrels per day, and has announced its intention to use the proposed pipe line of Texaco from El Paso to Tucson and Phoenix. If this is done, it will discontinue the use of existing transportation facilities, both rail and motor, from El Paso and Los Angeles Basin refineries.

"The increased amounts of refined petroleum products thus to be made available at El Paso for movement into Arizona is expected to relieve the present heavy demands made by Arizona consumption upon California production. In the California area crude oil is said to be in short supply since the demands for petroleum products on the Pacific coast exceed the present production of the California oil fields.

\*    \*    \*    \*    \*    \*

"There is a large surplus of petroleum crude oil in west Texas, which, with additional pipe-line facilities under construction, can be made available for refining at El Paso, and the demands of Arizona, which approximate 19,000 barrels per day, could be fully supplied from that point.

"When the * * * [rail carriers] were informed of the plan to construct the proposed pipe line, they negotiated with Texaco and Standard to determine whether reduced rail rates from El Paso to Arizona would hold the traffic to the rails * * *. [Cf. I. C. C. v. Mechling, supra, 330 U.S. at page 571, 67 S.Ct. 894, 91 L.Ed. 1102.]

"After computation of the estimated overall distribution costs based on the construction and use of the projected pipe line, the oil companies informed the * * * [rail carriers] of the approximate level of rail rates from El Paso which they would consider satisfactory as an alternative to the construction and operation of the pipe line. The rates from El Paso [were] arrived at by negotiation between the oil companies and the respondents * * *.

"It was recognized by the * * * [rail carriers] that the reduced rates from El Paso would place at a disadvantage refiners in southern California who do not operate refineries at El Paso and who have long been accorded, to the destination territory here considered, rates related to those from El Paso. They concluded that they would be warranted in establishing rates from south-

ern California on the same general level, distance considered, as the proposed rates from El Paso * * *." Cf. I. C. C. v. Inland Waterways Corp.; 1943, 319 U.S. 671, 685, 63 S.Ct. 1296, 87 L. Ed. 1655.

The majority report of the Commission next refers to the contentions of the tank-truck carriers and other protestants that "the rail-rate structure proposed * * * presents a novel and unlawful method of rate-making * * * that the proposed rates are unreasonably low and unjustly discriminatory * * * that the complete destruction of the tank-truck carriers' traffic by means of· rail-rate reductions is contrary to the national transportation policy declared in the act."

The majority report then proceeds: "In support of the proposed adjustment, the * * * [rail carriers] urge that the proposed rates * * * would yield revenue well above out-of-pocket costs and would thus contribute something to fixed charges."

And concludes: "We think the evidence herein relating to the proposal to build a pipe line from El Paso poses a real threat to continued participation in this traffic by both the rail and the motor carriers. Thus, the ultimate issue for our determination is whether or not the proposed rates are below reasonable minima. The record is persuasive that the proposed rates exceed the cost of rendering the service and are no lower than necessary to meet the threatened pipe-line competition. There is before us no warrant for a finding that the proposed rates are in any respect unlawful." Cf. Alabama G. S. R. Co. v. United States, 1951, 340 U.S. 216, 224, 71 S.Ct. 264, 95 L.Ed. 225; Eastern-Central Ass'n v. United States, 1944, 321 U.S. 194, 201–202, note 8, 64 S.Ct. 499, 88 L.Ed. 668; United States v.· Chicago Heights Trucking Co., 1940, 310 U.S. 344, 60 S.Ct. 931, 84 L.Ed. 1243; Miss. Valley Barge Co. v. United States, 1934, 292 U.S. 282, 288, 54 S.Ct. 692, 78 L. Ed. 1260.

The minority report, 287 I.C.C. at 737–739, filed by three of the five dissenting Commissioners states: "Here, a bare majority of the commission approves the proposal of * * * [the rail carriers] to reduce their rates on these products approximately 40 percent * * * on the premise that such rates will hold or attract traffic and return something more than out-of-pocket costs. * * * Pipe lines are included in our national transportation system. * * * Even less can be said in support of the drastic reductions in rates proposed from the Los Angeles area. The pipe line is proposed only from El Paso, Tex., not from Los Angeles, Calif. [Cf. I. C. C. v. Mechling, supra, 330 U.S. at page 579, 67 S.Ct. 894, 91 L.Ed. 1102.] * * * Moreover, the rates here approved by the majority are so low that the common-carrier tank-truck lines specializing in the transportation of petroleum products will be unable to compete, and will go out of business. * * * Tank-truck carriers provide transportation facilities which, in these critical times, and in the interest of national defense, which is also part of the transportation policy, are entitled to a fair chance of survival." See: Petroleum Products from Los Angeles to Arizona and New Mexico, 280 I.C.C. 509 (1951); Petroleum from California to Arizona and Nevada, 218 I.C.C. 345 (1936).

It may well be wise, as the majority of the Commission have decided, to sanction a rate reduction purposed only to prevent a pipe-line carrier from entering the field; to approve rates which will probably result in enabling rail carriers to drive out tank-truck carriers from a given segment of transportation service; to do this on the theory that the rails will grow stronger through increased volume at rates which "exceed the cost of rendering the service" and "contribute something to fixed charges"; and, thus grown stronger, be able to keep out the threatened invader.

It may also be wise to discount the gravity of the problem posed by the

envisioned possibility that once the pipe-line threat has subsided and tank-truck carriers have abandoned all endeavor to compete with an "approximately forty percent" rate reduction, the rail carriers may later conclude it was unfair and a mistake to ask other shippers in effect to pay part of the cost of transporting petroleum products into the area in question; and upon that ground request approval of total or partial restoration of the higher rates. Cf. Baltimore & Ohio R. Co. v. United States, 1953, 345 U.S. 146, 73 S.Ct. 592.

■ These are matters committed by the Congress to the judgment of the Commission, and the courts will not attempt to assay the wisdom of the administrative conclusion. Assigned Car Cases, 1927, 274 U.S. 564, 580, 47 S.Ct. 727, 71 L.Ed. 1204; The New England Divisions Case (Akron, C. & Y. R. Co. v. United States), 1923, 261 U.S. 184, 204, 43 S.Ct. 270, 67 L.Ed. 605; I. C. C. v. Illinois Cent. R. Co., 1910, 215 U.S. 452, 470, 30 S.Ct. 155, 54 L.Ed. 280. The judicial function is exhausted when there is found to be a rational basis for the conclusion reached by the administrative body. Miss. Valley Barge Co. v. United States, supra, 292 U.S. at pages 286, 287, 54 S.Ct. 692, 78 L.Ed. 1260.

■ The courts will, however, consider in every case whether there is a "lack of the basic or essential findings required to support the Commission's order." State of Florida v. United States, 1931, 282 U.S. 194, 215, 51 S.Ct. 119, 125, 75 L.Ed. 291.

The settled policy of our law is to require every tribunal, administrative as well as judicial, to reduce to writing the essential findings of fact and conclusions of law upon which decision is predicated. Fed.Rules Civ.Proc. rule 52(a), 28 U.S. C.A.; 5 U.S.C.A. § 1007(b); cf. 49 U.S. C.A. § 14(1); and see Dalehite v. United States, 1953, 346 U.S. 15, 73 S.Ct. 956.

■ "It is true that formal and precise findings are not required, under section 14(1) of the Interstate Commerce .Act, which declares that the report 'shall state the conclusions of the commission together with its decision.'" United States v. Baltimore & O. R. Co., 1935, 293 U.S. 454, 465, 55 S.Ct. 268, 273, 79 L.Ed. 587.

As the Court observed in Alabama G. S. R. Co. v. United States, supra, 340 U.S. at page 228, 71 S.Ct. at page 272, 95 L.Ed. 225: "The statute requires the Commission only to file a written report, stating its conclusions, together with its decision and order. * * * Of course § 14(1) does not relieve the Commission of the duty to make the 'basic' * * * findings essential to the statutory validity of an order. * * * And the basic findings essential to the validity of a given order will vary with the statutory authority invoked and the context of the situation presented." See also: City of Yonkers v. United States, 1944, 320 U.S. 685, 689, 694–695, 64 S.Ct. 327, 88 L.Ed. 400; United States v. State of Louisiana, 1933, 290 U.S. 70, 76, 78–80, 54 S. Ct. 28, 78 L.Ed. 181; Manufacturers R. Co. v. United States, 1918, 246 U.S. 457, 489–490, 38 S.Ct. 383, 62 L.Ed. 831; cf. Wichita R. & L. Co. v. Public Utilities Comm., 1922, 260 U.S. 48, 58–59, 43 S. Ct. 51, 67 L.Ed. 124.

In the proceeding at bar, enough has been quoted from the majority and minority reports to point up certain considerations of national defense which are patently intertwined with the transportation problems involved.

"It is * * * declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each * * * all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. * * *" 54 Stat. 899 (1940), 49 U.S.C.A. note preceding § 1.

The majority report refers to "a large surplus of petroleum crude oil in West Texas * * *" and to the fact that in the California area "crude oil is said to be in short supply since the demands for petroleum products on the Pacific coast exceed the present production of the California oil fields." Expert knowledge of transportation problems is not required to envisage the probable desirability of having at least one alternative method of transporting the "large surplus" of Texas oil to the Pacific coast to serve urgent, possibly vital, needs of national defense.

The majority report observes that the tank-truck carriers "stress the fact that there is presently a shortage of tank cars, and * * * argue that if the rail carriers should recapture all this traffic the tank-car shortage would be aggravated." But no finding is made with respect to these contentions; nor with respect to the claims made in the minority report that "the rates here approved are * * * contrary to the national transportation policy. * * * Pipe lines are included in our national transportation system. Tank-truck carriers provide transportation facilities which in these critical times, and in the interest of national defense * * * are entitled to a fair chance of survival."

The Congressional mandate of the National Transportation Policy demands that: "All of the provision of this [Interstate Commerce] Act shall be administered and enforced with a view to carrying out the * * * declaration of policy." 54 Stat. 899 (1940), 49 U.S. C.A. note preceding § 1.

Thus, the national defense factors involved at bar called for the expert consideration of the Commission. See: Oppenheim, The National Transportation Policy And Intercarrier Competitive Rates (1945); Williams, "The ICC and the Regulation of Intercarrier Competition," 63 Harv.L.Rev. 1349 (1950). See, also: 49 U.S.C.A. §§ 15a(2), 316(i), 907 (f), 1006(d).

It is clear from the cases that all relevant factors of the National Transportation Policy must at least be considered by the Commission in every proceeding. E. g. American Trucking Ass'ns v. United States, supra, 344 U.S. at pages 313–314, 73 S.Ct. 307; King v. United States, 1952, 344 U.S. 254, 263–264, 73 S.Ct. 259; Alabama G. S. R. Co. v. United States, supra, 340 U.S. at pages 226–228, 71 S.Ct. 264, 95 L.Ed. 225; United States v. Rock Island Co., 1951, 340 U.S. 419, 434–436, 71 S.Ct. 382, 95 L.Ed. 391; I. C. C. v. Parker, 1945, 326 U.S. 60, 66, 73, 65 S.Ct. 1490, 89 L.Ed. 2051; Eastern-Central Ass'n v. United States, supra, 321 U.S. at page 194, 64 S.Ct. 499, 88 L.Ed. 668; McLean Trucking Co. v. United States, 1944, 321 U.S. 67, 86–87, 64 S.Ct. 370, 88 L.Ed. 544. Cf. Ann Arbor R. Co. v. United States, 1930, 281 U.S. 658, 50 S.Ct. 444, 74 L.Ed. 1098; Cotton From Memphis and Helena to New Orleans, 273 I.C.C. 337, 367 (1948).

But "general statements in the reports to the effect that the Commission, in reaching its conclusions, considered all the pertinent evidence, add nothing to the prima facie presumption that generally attends determinations of the Commission. * * * Complete statements by the Commission showing the grounds upon which its determinations rest are quite as necessary as are opinions of lower courts setting forth the reasons on which they base their decisions in cases analogous to this." Beaumont, S. L. & W. R. v. United States, 1930, 282 U.S. 74, 86, 51 S.Ct. 1, 6, 75 L.Ed. 221.

A multo fortiori those reasons should be set out in the report where, as here, the grounds upon which the Commission's determinations rest "may touch vitally the public interest." Eastern-Central Ass'n v. United States, supra, 321 U.S. at page 209, 64 S.Ct. at page 507, 88 L.Ed. 668.

Perhaps the majority did consider the national defense factor of the transportation policy. Perhaps the majority agreed to a finding that present and

future needs of national defense will be fully served by aiding the rail carriers to eliminate tank trucks and keep out pipe lines, thus leaving tank cars alone to transport the "large surplus of petroleum crude oil in West Texas." But for aught that appears from the record and the report of the Commission here, the majority did not investigate or consider at all the national defense factor of the Transportation Policy.

Had they done so, they might have been prompted to consult the authoritative views of the Department of Defense. See F. C. C. v. RCA Communications, Inc., 1953, 346 U.S. 86, 94, note 5, 73 S.Ct. 998; cf. United States v. Pierce Auto Lines, 1946, 327 U.S. 515, 529, 533, 534–536, 66 S.Ct. 687, 90 L.Ed. 821. And had this been done, it is equally possible that the six Commissioners who comprise the majority, or at least one of them, might have concluded with their dissenting colleagues that the mandate of the National Transportation Policy would best be effectuated by leaving the rates as they now are and allowing the projected pipe line to enter the field, thus having the possibility of three modes of transporting petroleum products through the area in question to serve the needs of national defense, in preference to the present possibility of only one. See: United States v. Rock Island Co., supra, 340 U.S. at pages 434–436, 71 S.Ct. 382, 95 L.Ed. 391; Alabama G. S. R. Co. v. United States, supra, 340 U.S. at pages 226–227, 71 S.Ct. 264, 95 L.Ed. 225; I. C. C. v. Parker, supra, 326 U.S. at pages 66, 73, 65 S.Ct. 1490, 89 L.Ed. 2051; McLean Trucking Co. v. United States, supra, 321 U.S. at pages 85–88, 64 S.Ct. 370, 88 L.Ed. 544; I. C. C. v. Inland Waterways Corp., 1943, 319 U.S. 671, 691, 63 S.Ct. 1296, 87 L.Ed. 1655.

Mr. Edward M. Reidy, Chief Counsel for the Commission, informed us in the course of oral argument at the bar that in certain cases the Commission had consulted other interested and presumably better-informed agencies of the Government as to particular questions, but no

suggestion appears in the record that a similar course was followed here.

There is support in principle for the view that reports of the Commission should affirmatively disclose some indication that relevant factors of the National Transportation Policy have been considered. We express no opinion as to that, but we hold that minimum recognition of the National Transportation Policy requires an affirmative declaration by the Commission with respect to a factor so vitally affecting the public interest as does national defense. Cf. State of North Carolina v. United States, 1945, 325 US. 507, 515, 520, 65 S.Ct. 1260, 89 L.Ed. 1760.

Recognizing that "the basic findings essential to * * * validity of a given order will vary with * * * the context of the situation presented." Alabama G. S. R. Co. v. United States, supra, 340 U.S. at page 228, 71 S.Ct. at page 272, 95 L.Ed. 225, we judge the challenged order of the Commission by "the report, read as a whole", United States v. State of Louisiana, supra, 290 U.S. at page 80, 54 S.Ct. at page 33, 78 L.Ed. 181, and by "the record as a whole out of which the report arose." City of Yonkers v. United States, supra, 320 U.S. at page 695, 64 S.Ct. at page 333, 88 L. Ed. 400.

■ "The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." S. E. C. v. Chenery Corp., 1943, 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626.

■ "Facts conceivably known to the Commission, but not put in evidence, will not support an order." The Chicago Junction Case (Baltimore & Ohio R. Co. v. United States, 1924, 264 U.S. 258, 263, 44 S.Ct. 317, 319, 68 L.Ed. 667; cf. United States), v. Chicago, M. & St. P. R. Co., 1935, 294 U.S. 499, 511, 55 S.Ct. 462, 79 L.Ed. 1023.

■ In the light of all the facts and circumstances appearing from the record and the majority and minority reports, including the manifest considera-

tions of national defense involved and the silence of the majority report on that essential basis for the order of January 12, 1953, we hold that the order should be annulled because of the absence of any finding or other showing in the record of any investigation or consideration of national defense questions which the National Transportation Policy *ex necessitate* brought before the Commission in the proceeding.

To borrow language from Eastern-Central Ass'n v. United States, supra, 321 U.S. at page 210, 64 S.Ct. at page 507, 88 L.Ed. 668: "Upon a matter of such consequence and complexity, our function in review cannot be performed without further foundation than has been made. We do not mean by this to imply that the result the Commission has reached would not be sustained if a sufficient basis were supplied in the record. We do not undertake to determine what result the Commission should reach. But we cannot say the one at which it has arrived has the sanction of law without further basis than we now have." See 5 U.S.C. § 1007(b).

For the reasons stated, then, the Commission's order of January 12, 1953 must be annulled. This order, by its terms, merely declares that the investigation and suspension proceeding under 49 U.S.C.A. § 15(7) "be, and it is hereby, discontinued," but the record and the report of the Commission disclose that the order was made "after full hearing."

Section 15(7) declares that "after full hearing, whether completed before or after the rate * * * goes into effect, the commission may make such order with reference thereto as would be proper in a proceeding initiated after it had become effective." 49 U.S.C.A. § 15(7). Which is to say that the Commission's findings and order at bar are analogous to a finding and order in a complaint proceeding under § 13(1) that the carrier-made rates are "just and reasonable" and are not shown to be unlawful. 49 U.S.C.A. §§ 13(1), 15(1); I. C. C. v. Inland Waterways Corp., supra, 319 U.S. at pages 673, 677–680, 682–

683, 685–687, 688–690, 703, 63 S.Ct. 1296, 87 L.Ed. 1655; I. C. C. v. Mechling, supra, 330 U.S. at pages 568–574, 583, 67 S.Ct. 894, 91 L.Ed. 1102.

The Commission here found "that the proposed schedules are just and reasonable, and are not shown to be unlawful." This does not constitute a finding that the rates were lawful, since rates "may lie within the zone of reasonableness" and yet be unlawful. United States v. Illinois Cent. R. Co., 1924, 263 U.S. 515, 524, 44 S.Ct. 189, 193, 68 L.Ed. 417; I. C. C. v. Inland Waterways Corp., supra, 319 U.S. at page 685, 63 S.Ct. 1296, 87 L.Ed. 1655.

Moreover, as noted in I. C. C. v. Inland Waterways Corp., supra, 319 U.S. at page 686, 63 S.Ct. at page 1305, 87 L.Ed. 1655: "The finding * * * that the proposed schedules 'are not shown to be * * * unlawful' * * * has been held by the Commission not to constitute an approval or a prescription of the rates under suspension. * * * they stand only as carrier-made rates * * *."

But the finding "that the proposed schedules are just and reasonable," unless set aside, would become "res judicata" in effect; with the result that the Commission "may not at a later time, and upon the same or additional evidence as to the fact situation existing when its previous order was promulgated," make findings to a materially different result. Arizona Grocery Co. v. Atcheson, etc. Santa Fe Ry. Co., 1932, 284 U.S. 370, 390, 52 S.Ct. 183, 186, 76 L.Ed. 348.

Once an order of the Commission is annulled, supporting findings become *in fieri*. United States v. U. S. Smelting etc. Co., 1950, 339 U.S. 186, 198, 70 S.Ct. 537, 94 L.Ed. 750; Virginian R. v. United States, 1926, 272 U.S. 658, 665–666, 47 S.Ct. 222, 71 L.Ed. 463. Hence our judgment annulling the Commission's order of January 12, 1953 will operate to set aside the Commission's findings. United States v. U. S. Smelting etc. Co., supra, 339 U.S. at pages 198–199, 70 S.Ct. 537, 94 L.Ed. 750;

Ford Motor Co. v. N. L. R. B., 1939, 305 U.S. 364, 372–376, 59 S.Ct. 301, 83 L.Ed. 221; Restatement, Judgments, § 41(b), (d) (1942).

There remains the question whether this court should do more than annul the Commission's order; specifically whether injunctive relief is required to preserve the *status quo* pending further proceedings before the Commission.

Defendant rail carriers urge that "the court lacks power * * * when reviewing an order of the Commission, to enjoin the railroads, either temporarily or permanently, from publishing particular proposed rates"; that an injunction such as that embodied in the temporary restraining order entered in this case, so the argument goes, "amounts to a suspension of the rates, a function which Congress has seen fit to delegate exclusively to the * * * Commission and not to the courts."

The power to suspend the effectiveness of a carrier-made rate is, by the terms of 49 U.S.C.A. § 15(7), "intrusted to the Commission only." Board of Railroad Com'rs v. Great Northern Ry., 1930, 281 U.S. 412, 429, 50 S.Ct. 391, 396, 74 L.Ed. 936. And the Commission, furthermore, has no power to suspend such a rate "for a longer period than seven months beyond the time when it would otherwise go into effect * * *." 49 U.S.C.A. § 15(7).

These provisions, as well as the added requirement of § 15(7) that "the Commission shall give to the hearing and decision of such [rate] questions preference over all other questions pending before it and decide the same as speedily as possible," express the clear policy of the law that rate questions be settled with as little delay as possible.

The Congressional intent plainly is that the courts not interfere to suspend carrier-made rates "prior to an appropriate finding by the Interstate Commerce Commission". Board of Railroad Com'rs v. Great Northern Ry., supra, 281 U.S. at page 429, 50 S.Ct. at page 396, 74 L. Ed. 936.

The express statutory grant of jurisdiction in cases such as this declares that: "The pendency of an action to enjoin, set aside, annul, or suspend any order of the Interstate Commerce Commission shall not of itself stay or suspend the operation of the order, but the court may restrain or suspend, in whole or in part, the operation of the order pending the final hearing and determination of the action." 28 U.S.C. § 2324; see id. §§ 1336, 2284, 2325.

Additionally, it has been expressly held that this court has the inherent equitable power, following "final hearing and determination of the action", to award injunctive relief "ancillary to setting aside the order of the Commission * * * in order to carry out the purpose of Congress to make the judicial review effective." Pittsburgh & W. Va. Ry. Co. v. United States, 1930, 281 U.S. 479, 488, 50 S.Ct. 378, 381, 74 L.Ed. 980; see also: Inland Steel Co. v. United States, 1939, 306 U.S. 153, 59 S.Ct. 415, 83 L.Ed. 557; Central Kentucky Gas Co. v. Railroad Comm., 1933, 290 U.S. 264, 54 S.Ct. 154, 78 L.Ed. 307.

Nowhere does there appear any manifestation of Congressional intent to deprive the district courts of their inherent equity jurisdiction to employ the writ of injunction in maintaining the *status quo* pending hearing and determination of an action, see United States v. United Mine Workers, supra, 330 U.S. at pages 290–295, 67 S.Ct. 677, 91 L.Ed. 884, or "in affording relief which it was the purpose of Congress to ensure", whenever such a course is necessary to the effectiveness of the court's decree. The Chicago Junction Case, supra, 264 U.S. at page 270, 44 S.Ct. at page 321, 68 L.Ed. 667.

There is basis of course for contention that the same Congressional policy which limits the Commission's power to suspend carrier-made rates in an investigation and suspension proceeding, 49 U.S.C.A. § 15(7), should prompt the courts to hold by analogy that their power to preserve the *status quo* as to such rates is similarly limited in point of time. Use of legislative-made precedent as author-

ity in situations not directly covered by the statute is a sound and useful procedure. See: United States v. Freeman, 1845, 3 How. 556, 44 U.S. 556, 565, 11 L.Ed. 724; Stone, "The Common Law in the United States," 50 Harv.L.Rev. 4, 12 (1936); Landis, "Statutes and the Sources of Law," Harvard Legal Essays, 213, 214–218 (1934); Pound, "Common Law and Legislation," 21 Harv.L.Rev. 386 (1909).

It is unnecessary, however, to determine whether this is a proper situation in which to give application to the "equity of the statute," because we have now reached the time for decision on the merits and have concluded moreover, for reasons next to be stated, that further injunctive relief will be unnecessary. Cf. I. C. C. v. Mechling, supra, 330 U.S. at pages 573–574, note 6, 67 S.Ct. 894, 91 L.Ed. 1102.

In other investigation and suspension proceedings under 49 U.S.C.A. § 15(7), it has been held sufficient to annul and enjoin enforcement of the order "to the extent that it permitted" the carrier-made change in rate. I. C. C. v. Mechling, supra, 330 U.S. at pages 569, 573, 574 note 6, 583, 67 S.Ct. 894; cf. James McWilliams Blue Line v. I. C. C., D.C.S. D.N.Y.1951, 100 F.Supp. 66, 71, affirmed per curiam, 1952, 342 U.S. 951, 72 S.Ct. 626, 96 L.Ed. 707; I. C. C. v. Inland Waterways Corp., supra, 319 U.S. at pages 683, 686, 703, 63 S.Ct. 1296, 87 L.Ed. 1655.

Here the Commission's order of January 12, 1953 does not permit the carrier-made change in rate. By its terms the order under review does no more than direct that the pending investigation and suspension proceeding under 49 U.S.C.A. § 15(7) be discontinued.

As already stated, subsequent to the order of January 12, 1953 and prior to notice to the Commission of the court's temporary restraining order, the effective date of the reduced rates (then under voluntary suspension by defendant rail carriers until February 8) was advanced to February 5, 1953. See 49 U.S.C.A. § 6(3). Thereafter and on April 6, 1953 the petitions for reconsideration were denied, thus terminating the pending investigation and suspension proceeding before the Commission. 49 U.S.C.A. § 17(6–9).

On April 18th defendant rail carriers restored the *status quo ante* by voluntarily reinstating the higher rates which had prevailed prior to February 5, 1953. See 49 U.S.C.A. § 6(3). As there is no proceeding now pending before the Commission involving those rates, it will not be possible in our opinion for the rail carriers again to lower the rates, without first filing schedules as provided in § 6 of the Act. 49 U.S.C.A. § 6.

Furthermore, once such schedules have been filed, plaintiff tank-truck carriers may again complain against the proposed rates. Cf. 49 U.S.C.A. §§ 13(1), 15(1). The Commission may thereupon proceed with a new investigation and suspension proceeding, cf. I. C. C. v. Inland Waterways Corp., supra, 319 U.S. at pages 688–690, 63 S.Ct. 1296, 87 L.Ed. 1655, and make new findings and a new order, 49 U.S.C.A. § 15(7); the findings and order of January 12, 1953 being annulled and set at large by the judgment to be entered in this action. See: United States v. U. S. Smelting etc. Co., supra, 339 U.S. at pages 198–199, 70 S.Ct. 537, 94 L.Ed. 750; Ford Motor Co. v. N. L. R. B., supra, 305 U.S. at pages 372–376, 59 S. Ct. 301, 83 L.Ed. 221; Arizona Grocery Co. v. Atchison etc. Santa Fe. Ry. Co., supra, 284 U.S. at pages 388–390, 52 S.Ct. 183, 76 L.Ed. 348.

Finally, any order which might hereafter be made by the Commission, in either a new proceeding or the proceeding here under review, would be "subject to challenge if not adequately supported or the [Commission] * * * failed to act in accordance with the statutory requirements," Ford Motor Co. v. N. L. R. B., supra, 305 U.S. at page 374, 59 S.Ct. at page 307, 83 L.Ed. 221; and would moreover be subject to stay pending suit in the district court. 28 U.S.C. §§ 1336, 2324, 2284, 2325.

Under these circumstances, it is unnecessary to grant any injunctive

relief "ancillary to setting aside the order of the Commission". Pittsburgh & W. Va. R. Co. v. United States, supra, 281 U.S. at page 488, 50 S.Ct. at page 381, 74 L.Ed. 980. And the restraining order now in effect becomes moot, since the result of our judgment annulling the Commission's order will be "to leave in effect" the higher rates which existed prior to the investigation and suspension proceeding involved in this action. I. C. C. v. Mechling, supra, 330 U.S. at pages 573–574, 67 S.Ct. 894, 91 L.Ed. 1102.

Accordingly, solicitors for plaintiffs will submit pursuant to local rule 7 within twenty days findings of fact, conclusions of law and judgment annulling the Commission's order of January 12, 1953.

STEPHENS, Circuit Judge, and JAMES M. CARTER, District Judge, concur.