The **COLUMBIA TRANSPORTATION COMPANY, Inc., Roen Steamship Company, Nicholson Transit Company,** and **The Great Lakes Ship Owners Association, Plaintiffs,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

**No. 17069.**

United States District Court
E. D. Michigan, S. D.
Oct. 2, 1958.

Marlin F. Scholl, Detroit, Mich., Kenneth J. McAuliffe, New York City, for plaintiffs.

Fred W. Kaess, U. S. Atty., Detroit, Mich., Victor R. Hansen, Asst. Atty. Gen., for the United States.

Robert W. Ginnane, Arthur J. Cerra, Washington, D. C., for Interstate Commerce Commission.

Walter A. Kleinert, Detroit, Mich., Hewitt Biaett, Richmond, Va., James F. Schouman, Detroit, Mich., John A. Daily, New York City, Kemper A. Dobbins, Cleveland, Ohio, John L. Davidson, Jr., and Eugene S. Davis, St. Louis, Mo., for intervenors.

Before SIMONS, Circuit Judge, and THORNTON and O'SULLIVAN, District Judges.

This three judge court was composed in accordance with Sections 2284 and 2325, Title 28 United States Code. The plaintiffs herein seek to enjoin and invalidate an Order of the Interstate Commerce Commission which approved a tariff for rail transportation of sulphur from Chicago, Illinois, to Detroit, Michigan. Plaintiffs, Columbia Transportation Company, Inc., Roen Steamship Company and Nicholson Transit Company, are Great Lakes water carriers. Of these plaintiffs, however, only one, the Columbia Transportation Company, Inc., was, at and prior to the commencement of this litigation, engaged in carrying sulphur on the Great Lakes in competition with the railroads which established the rate in controversy. Plaintiffs Roen Steamship Company and Nicholson Transit Company participate in the proceedings because of an expressed fear that a continuance of the contested rate would force the Columbia Transportation Company, Inc., into more serious competition with them for other lines of business to make up for Columbia's feared loss of sulphur business. Great Lakes Ship Owners Association is an association of Lake Carriers. Intervening in support of the Order of the Interstate Commerce Commission are the following railroads: Chesapeake & Ohio Railroad Company; Grand Trunk Western Railroad Company; New York Central Railroad Company; New York, Chicago & St. Louis Railroad Company; and Wabash Railroad Company.

The mentioned railroads individually published a local rail rate of $3.45 per gross ton of 2,240 pounds for the transportation of "sulphur (Brimstone) crude, unground" from Chicago, Illinois, to Detroit, Michigan, effective March 15, 1955. The applicable minimum weight was one hundred thousand pounds. By various procedural steps, plaintiffs herein attacked the rate so established by the railroads, claiming it to be so low as to con-

stitute destructive competition which would eliminate water carriage of sulphur from Chicago to Detroit, and so low and of such character as to be violative of the national transportation policy. The Interstate Commerce Commission found that the rate under attack was just and reasonable and not otherwise unlawful. General Chemical Division, Allied Chemical and Dye Corporation, hereinafter referred to as General Chemical, a user of sulphur at Detroit, intervened before the Commission in support of the railroads. Nicholson Transit Company and Roen Steamship Company, and Great Lakes Ship Owners Association, plaintiffs herein, appeared before the Interstate Commerce Commission in support of the protest of Columbia Transportation Company.

A full understanding of plaintiffs' claims requires some detailed review of various steps in the procedure before the Interstate Commerce Commission.

On February 28, 1955, Columbia Transportation Company filed its protest and requested suspension of the involved rate as published by the Wabash, Grand Trunk and New York Central Railroads. On March 11, 1955, the Commission ordered the rate as established by the Wabash, Grand Trunk and New York Central Railroads suspended, and instituted an investigation thereof. On April 8, 1955, plaintiff Columbia Transportation Company petitioned Interstate Commerce Commission to investigate the same rate, also established and published by the Chicago & St. Louis Railroad Company and the Chesapeake & Ohio Railroad Company. On April 28, 1955, the Commission vacated the suspension order but continued its investigation; and on the same date, the Commission, on its own motion, instituted investigation of the aforesaid rate as established and published by the New York, Chicago & St. Louis Railroad Company and the Chesapeake & Ohio Railroad Company. Accordingly, the rate under attack as established by all of the respondent railroads, was investigated by the Interstate Commerce Commission. A hearing thereon

was had in June, 1955, before examiner Riley A. Gwynn. ·On November 16, 1955, examiner Gwynn filed his Proposed Report, recommending that the Commission find that the reduced rate is just and reasonable and not otherwise unlawful, and the investigation of the rate should be discontinued. On December 22, 1955, plaintiffs herein filed exceptions to the Proposed Report and on the same day plaintiff Columbia Transportation Company, Inc., filed a petition with the Commission for further hearing. On April 2, 1956, the Commission denied the petition of Columbia Transportation Company, Inc., for further hearing. On April 11, 1956, the Commission issued its report concluding that the rate under investigation was just and reasonable, and entered its order discontinuing the proceeding. On June 25, 1956, plaintiff Columbia Transportation Company, Inc., Roen Steamship Company and the Great Lakes Ship Owners Association filed a joint petition for further hearing before the Commission, or in the alternative, reconsideration by the Commission, or oral argument. On September 13, 1956, the Commission denied the last mentioned petition. On February 13, 1957, plaintiffs Columbia Transportation Company, Inc., Roen Steamship Company and the Great Lakes Ship Owners Association filed a joint petition for waiver of rule 101(e) of the General Rules of Practice, 49 U.S.C.A.Appendix, and for leave to file on the same day a petition for correction of the record of the proceedings to include testimony omitted from the transcript, and reconsideration by the Commission on the merits, upon the record as corrected. On May 31, 1957, the Commission granted leave to file the petition, but denied the request for correction of the record and for reconsideration of the case on the merits.

On August 29, 1957, plaintiffs filed the instant complaint. It named the United States and the Interstate Commerce Commission as defendants. Upon leave granted, the Chesapeake & Ohio Railroad Company, the Grand Trunk Western Railroad Company, the New York Cen-

tral Railroad Company, and the New York, Chicago & St. Louis Railroad Company, and the Wabash Railroad Company, who will hereafter be referred to as the railroads, or intervenors, intervened in the cause.

At the time of and prior to the establishment of the rate in question by the railroads, sulphur had been transported to consumers thereof in Detroit, Michigan, from Galveston, Texas, and Port Sulphur, Louisiana, by the following three methods:

(1) On railroads from point of origin to Detroit, Michigan, sometimes referred to as all-rail;

(2) On water, that is, by barge on the Mississippi River to Chicago, then by Great Lakes water carriers from Chicago to Detroit;

(3) By combination barge and railroad; barge to Chicago and then by rail from Chicago to Detroit; sometimes referred to as barge-rail.

It is the claim of the plaintiffs that the establishment of the questioned rail rate from Chicago to Detroit, when used in combination with the barge rate to Chicago, is so low as to result in destructive competition to the Great Lakes water carriers and to be violative of the national transportation policy. It is recognized in the transportation industry that because users of such a commodity as sulphur find rail delivery more convenient to them than delivery by water, water carriers must be able to offer a lower rate to shippers to remain in competition with the railroads. Plaintiffs contend that the rate established by the railroads of $3.45 from Chicago to Detroit is so low as to eliminate a sufficiently substantial differential between the rail rate and the water rate between Chicago and Detroit. The Commission found as a fact that the difference in cost to receivers of sulphur in Detroit between having the sulphur brought in by barge-lake carriage as against the barge-rail rate was approximately 39 cents. It found that the total cost to the consignee at Detroit for barge-rail carriage to De-

troit from Louisiana was $7.75 per gross ton, as against $7.36 per gross ton for barge-lake carriage from Louisiana to Detroit.

Plaintiffs further contend that the 39 cent differential found by the Commission is not an accurate computation of the actual differential that will exist if the rail rate from Chicago to Detroit of $3.45 per gross ton is permitted to stand.

Before discussing the general merits of the case, two claimed procedural errors, charged against the Commission should be disposed of.

In their testimony as to the cost to the shipper of having sulphur brought by barge to Chicago and rail to Detroit, the railroads included a charge of 45 cents per gross ton for transfer from barge to rail at Chicago. The largest user of crude sulphur at Detroit is General Chemical. Contending that the transfer charge of 45 cents at Chicago was too high, the plaintiff offered a witness Durant, who attempted to testify that the transfer at Chicago could be made at a cost of approximately 25 cents if General Chemical would itself make the transfer, using its own dock and other facilities located in Chicago. The witness was manager of a dock at Saginaw, Michigan, and had served as Captain of lake vessels transporting sulphur. He had no actual experience with such a transfer operation and testified that at his employer's dock at Saginaw they had not actually handled any sulphur, but handled considerable tonnage of scrap iron, and used a magnet rather than the bucket used in the sulphur operation. He did indicate, however, that he felt the handling rate per ton would be comparable. He said that he had visited the General Chemical plant in Chicago on two occasions, the most recent visit being one and one-half years before giving his testimony. He did not go there to study cost account methods; he did not know stevedoring charges in Chicago at General Chemical plant and he had actually no first hand knowledge of what it would cost General Chemical to transfer a ton of chemical from a barge to an

open top rail car. His company did not handle any barges at Saginaw. After extended examination of this witness, the examiner sustained an objection to the introduction of Exhibit 20 which contained this witness' estimate of the cost of transfer at Chicago based upon his assumption that the work could be done by General Chemical with its own facilities. Representatives of the General Chemical testified that they would not use their own facilities to make the transfer referred to, as it would not be in keeping with their method of operation there.

▮▮▮▮ We feel that it was within the competence of the examiner and the Interstate Commerce Commission to conclude whether or not the witness Durant possessed sufficient qualifications to give an opinion or estimate on the cost of the transfer operation in question. Our reading of the testimony does not convince us we should find error in the questioned ruling.

The language of the U. S. Supreme Court in the case of Spiller v. Atchison, T. & S. F. R. Co., 253 U.S. 117, 40 S.Ct. 466, 471, 64 L.Ed. 810, guides our thinking in this regard:

"Whether he had shown such special knowledge as to qualify him to testify as an expert was for the Interstate Commerce Commission to determine; and its decision thereon is not to be set aside by the courts unless clearly shown to have been unfounded, which cannot be said in this case."

We conclude, also, that even if the evidence of the witness Durant should have been received for whatever it was worth, it would not affect the final decision of the Interstate Commerce Commission. The testimony that 20 cents per ton could be saved in the transfer operation at Chicago was bottomed upon the assumption that General Chemical would perform this transfer with its own equipment and its own facilities. The uncontradicted evidence, however, is that General Chemical would not perform these services and, according to its representatives who appeared as witnesses, it did not have facilities to do this work in

keeping with the efficient operation of its business. This testimony is not denied. In addition to this, it is obvious that General Chemical had a right to purchase total transportation service from origin to destination the same as any other purchaser of sulphur.

Another question of claimed procedural impropriety arises from the following circumstances: At the hearing before the examiner, a witness for the water carriers, protestants there, read a prepared statement. The court reporter did not take this statement in full, but relied upon a copy thereof which was furnished to him. In writing up the transcript, which was before the Commission on its hearing, the stenographer failed to include a portion of the prepared statement. After the Commission had made its decision and after it had denied applications for further hearing, reconsideration and oral argument, the Columbia Transportation Company, Inc., and its allied protestants, becoming aware of the omission from the transcript, filed a petition to correct the record so as to include the omitted testimony. This was filed February 13, 1957, and included a prayer that the Commission reconsider the merits of the case upon the record as corrected. On May 31, 1957, the Commission granted the protestants leave to file the mentioned petition, but denied the request for correction of the record and for reconsideration. Apparently assuming that the transcript was complete, protestants' counsel included a digest of the missing portion of the testimony in their brief which presented protestants' case to the Commission, and argued its importance on the questions under consideration. The petition to correct the record and for reconsideration included a recital of the omitted testimony. In entering the last mentioned Order, the Commission stated:

"More than ten months prior to the filing of the petition, essential portions of the omitted evidence were referred to by the protestants in their petition for further hearing and reconsideration, and it does not appear that the matter omitted from

the transcript of the testimony is such that its omission prejudiced the protestant water carriers."

Briefs filed by the plaintiffs in this court charge the Commission with error; first, because it is claimed the Commission decided the case without having before it all testimony taken before the examiner; and secondly, because by finding that its omission did not prejudice the protestant water carriers, they considered matters outside of the record. In their brief before this Court, plaintiffs say that:

"the Commission carefully spells out * * * that it *has* considered testimony *not* in the record * *"

The brief then charges that:

"The Commission capriciously declined to make the entire record available either for its own consideration, the use of plaintiffs, or for consideration by this Court."

It is quite obvious that these plaintiffs, protestants before the examiner and before the Interstate Commerce Commission, had the omitted testimony considered by those who passed upon the merits of their contentions. Whether there were mechanical defects in the procedure should not be considered by this Court unless such defects affected the merits of the case, and in some way deprived plaintiffs of opportunity to fully present their position. We do not believe that there was any prejudice and, therefore, decline to find prejudicial error in the action of the Interstate Commerce Commission in failing to formally correct the record and reconsider the case on the basis of the so-called corrected record.

While plaintiffs' brief in this court sets forth some fourteen claimed errors of the Commission, some of which are disposed of in the procedural questions discussed above, we feel that all of the remaining errors relied upon can be classified as follows:

(a) That the Commission ignored various categories of evidence offered by plaintiffs at the hearing;

(b) That the Commission's Order did not contain adequate Findings of Fact, thus to disclose that it had considered plaintiffs' evidence;

(c) That the Order and conclusion of the Commission were without support of substantial evidence;

(d) That the Commission's report does not disclose that it gave consideration to, or made findings upon, the question of whether approving the rate involved was in keeping with national transportation policy, particularly the interests of our national defense; and

(e) A general charge that the Commission's report was arbitrary, capricious, without a rational basis in fact, constituted an abuse of discretion, and contained conclusions not supported by adequate findings or evidence.

Before discussing these various headings, we consider what was the duty of the Commission and what is the function of this Court in passing upon the propriety and legality of the action taken by the Interstate Commerce Commission.

Under the Transportation Act, it was the duty of the Commission, in making its report:

" * * * to make a report in writing in respect thereto, which shall state the conclusions of the commission, together with its decision, order or requirement in the premises; and in case damages are awarded such report shall include the findings of fact on which the award is made." Interstate Commerce Act, 49 U.S.C.A. § 14(1).

Under the Administrative Procedure Act, which applies to the proceeding before the Commission, it is required that:

" * * * all decisions * * * shall become part of the record and include a statement of (1) findings and conclusions, as well as the reasons or basis therefor, upon all the material issues of fact, law, or discretion presented on the record; and (2) the appropriate rule, order, sanction, relief, or denial thereof." Ad-

ministrative Procedure Act, 5 U.S.C.A. § 1007(b).

The function of this Court, called upon to review the action of the Commission, is defined in the statute as follows:

" * * * the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of any agency action. It shall (a) compel agency action unlawfully withheld or unreasonably delayed; and (b) hold unlawful and set aside agency action, findings, and conclusions found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) * * * (4) without observance of procedure required by law; (5) unsupported by substantial evidence; * * * In making the foregoing determinations the court shall review the whole record or such portions thereof as may be cited by any party, and due account shall be taken of the rule of prejudicial error." 5 U.S.C.A. § 1009(e).

We shall, therefore, review the charges made against the action of the Commission against the background of the above statutory definitions of the respective functions of the Commission and of this Court.

To test the propriety of the action of the Commission, it is necessary to review what the evidence at the hearing disclosed. Some facts were in dispute, but a recital of the following portion of the Commission's report gives a fair factual background of the matters in issue:

"Sulphur traffic originates principally in Louisiana and Texas. No traffic has moved under the present rail rate of 36.8 cents per 100 pounds ($8.24 per gross ton) minimum 60,-000 pounds. While the reduced rate is published as a local rate from Chicago to Detroit, it is intended to be used in combination with barge rates to Chicago, thus making available barge-rail transportation from Louisiana and Texas origins to Detroit in competition with barge-lake service. Beginning in 1954, the rail carriers were virtually excluded from sulphur traffic to Detroit as a result of two successive reductions in the rates for water transportation, influenced in part by competition with unregulated water carriers. Prior to that time there had been a substantial all-rail movement of sulphur to Detroit. It was for the purpose of regaining a share of this Detroit traffic that the reduced rate from Chicago to Detroit was established.

"General Chemical is the largest user of crude sulphur at Detroit. The comparative costs per gross ton for the competing barge-rail and all-water services from Port Sulphur, Louisiana, to the Detroit plant of General Chemical are shown in the table below. To the plants of other users in Detroit, slight variations in terminal costs occur due to varying locations.

|  | Barge-rail | Barge-lake |
|---|---|---|
| "Barge rate to Chicago | $ 3.60 | $ 3.60 |
| Transfer chg at Chicago | .45 | .225 |
| Rail rate to Detroit | 3.45 | |
| Lake rate to Detroit | | 2.52 |
| Insurance | | .017 |
| Truck delivery to plant | | 1.00 |
| Unloading at Detroit | .25 | |
| Total costs | 7.75 | 7.362 |

"The resulting differential in favor of the barge-lake service thus approximates 39 cents. In contending that the differential is less than shown, the protestant made an offer of evidence that the cost of transfer from barges to rail cars at Chicago would not amount to 45 cents in the case of traffic received by General Chemical, which might perform its own transfer service by using the facilities of its dock and plant at Chicago. Upon objection by the respondents, the examiner ruled the evidence inadmissible. The witness who testified in this respect managed a dock at Saginaw, Michigan, and had served as a captain of lake vessels transporting sulphur. His estimate that General Chemical could transfer sulphur from barge to rail cars for 25 cents was based on his experience as to the cost of transferring scrap iron at the Saginaw dock. No sulphur is terminated at the latter dock. We conclude that the witness' knowledge of the operations and costs of General Chemical was insufficient to enable him to make a reasonably accurate estimate, and the ruling of the examiner is sustained. The traffic consultant of General Chemical testified that the company would not undertake the transfer service because of resulting congestion at the Chicago plant if traffic destined to Detroit were handled.

"Because of the disadvantages of water transportation a rate differential in favor of that service is frequently necessary if water carriers are to participate in traffic. The protestant contends that the barge-rail service to Detroit via Chicago will be substantially equivalent to all-rail service and as a result the 39 cent differential will not permit the lake carriers to retain any of the traffic.

"While barge-lake service cannot be used during the winter months, barge-rail transportation is available throughout the year. Use of the latter service would tend to reduce the amount of stockpiling necessary at destination and to assist the consignee in meeting fluctuating demands for sulphur. The maintenance of reserve supplies, however, cannot be wholly avoided, and barge-rail service is not as desirable in this respect as all-rail service.

"The rate of the barge line transporting most of the sulphur tonnage to Chicago are subject to a minimum of 1,000 tons. While the avoidance of demurrage on barges at Chicago requires the unloading of only 100 tons per day, equivalent to two rail carloads, the consignee anticipates unloading at a rate equivalent to approximately 10 rail carloads per day. The Detroit plant consumes about 7,000 tons a month when operating at full capacity; at the time of hearing it was operating at about 50 percent of capacity. A substantial part of the sulphur transported in barge-rail service must therefore be unloaded into a stockpile.

"The shorter time in transit, usually an important advantage of rail transportation, is not significant in comparing the inherent advantages of barge-rail service on this traffic. The long barge haul from Louisiana or Texas origins to Chicago results in a total transit time by barge-rail from origin to Detroit of approximately 31 days, while the total transit time of barge-lake shipments is about 42 days. Transit time of 10 or 11 days is required for all-rail shipments.

"For the rail lines which transport the traffic, the reduced rate produces revenue per car ranging from $115.60 to $175.95, and per car-mile from 49.28 to 64.66 cents. Such earnings are considerable above the average expense per car-mile for all freight traffic transported by each of the respondents, which ranges from 27.17 to 39.17 cents.

"The protestant and supporting intervener concede that the reduced rate is compensatory, but take the position that it is so low the lake carriers will be excluded from participation in the traffic. They urge that it constitutes an unfair and destructive competitive practice in violation of the national transportation policy. No traffic moved under the reduced rail rate during the three months between the date when the rate became effective and the date of the hearing herein, and at that time no future movements had been scheduled. General Chemical's purchasing officer testified that traffic to Detroit would be divided about equally between the competing routes, with the preponderance moving all-water during the season of navigation and barge-rail during the closed season."

In addition to this factual recital contained in the Commission's report, evidence of the following facts was offered and received in the hearing before the examiner.

Prior to, and during World War II, chemical plants in the New York harbor area were set up to take their sulphur by vessel and not by rail. For the most part, sulphur was handled by belt conveyor from a vessel directly to stock pile. There were no railroad tracks in the vicinity of the unloading or stockpiling. Because of enemy submarine danger, Atlantic coastwise transportation of sulphur became too perilous. Vessels normally transporting it were taken over by the Government for other needed service. Railroads were needed for other transportation. As a result, a plan was devised whereby sulphur for the chemical plants around the New York harbor area was transported entirely over inland waterways—by barge to Chicago, thence via lake steamers to Buffalo, and there transferred to barges for movement via the New York State Barge Canal to the New York chemical plants.

During the period from 1941 through 1945, the Columbia Transportation Company carried some 811,718 net tons of sulphur over the Great Lakes as a part of this inland water transportation. During that period of time, an order of the Office of Defense Transportation prohibited movement of sulphur to any lake destination if it in any way interfered with sulphur movements to the New York harbor area, and dealers at lake ports were limited to what water carriers could transport to those ports before opening of the New York Barge Canal in the spring and after its closing in the fall. Notwithstanding this prohibition, a substantial tonnage was delivered to Great Lakes ports during the years from 1942 through 1945.

At the hearing before the examiner in June, 1955, A. B. Cozzens, manager of the crane vessel department of plaintiff Columbia Transportation Company, Inc., testified that if the tonnage then moving to General Chemical at Detroit was divided equally between all-water and barge-rail carriage, the Columbia Transportation Company would still be better off, from the standpoint of amount of tonnage carried to Detroit, than it was in 1953, prior to reducing its own rate in the year 1954. Plaintiffs' exhibit 29 showed the percentage of Columbia's sulphur traffic to the total amount of regulated commodities carried by it for the years 1953 and 1954. Its sulphur tonnage in 1953 was 17.8 percent of such regulated tonnage and 19.8 percent thereof in 1954. The witness Cozzens likewise testified that of its total traffic 25 percent was regulated and 75 percent unregulated.

We are satisfied that the facts contained in the quoted portion of the Commission's report and those which we have recited were all supported by substantial evidence offered and received at the hearing before the examiner and included in the record before the Commission, except those facts relating to war time handling of sulphur in the New York harbor area which we find in Appendix B to the plaintiffs' petition to correct the record. This latter subject, therefore, was before the Commission before its

final denial of the petition for reconsideration.

■ Plaintiffs assert that the Commission's Order ignored evidence offered by them, and recite evidence which they claim the Commission ignored. The fact that the Commission did not in its report discuss various portions of testimony offered by plaintiffs, and give its reasons why it did not accept such evidence as controlling its decision, does not, in our opinion, constitute ignoring that evidence. Inasmuch as the Commission's report contained ultimate facts which it found from the record, it cannot be said that the Commission ignored any evidence that was before it. Failure to give to evidence the weight claimed for it by a party does not amount to ignoring such evidence.

On the question of whether or not the Commission's report made adequate findings, we should look to what the courts have said as to the responsibility and duty of the Commission in this regard. In the case of Alabama Great Southern Railway Co. v. United States, 340 U.S. 216, at page 227, 71 S.Ct. 264, at page 272, 95 L.Ed. 225, the Court said:

"As to the contention of appellants that the Commission's order is not supported by essential findings of fact, § 14(1) of the Interstate Commerce Act, 49 U.S.C. § 14(1), 49 U.S.C.A. § 14(1), does not require the Commission to make detailed findings of fact except in a case where damages are awarded. Manufacturers R. Co. v. United States, 246 U.S. 457, 487, 489–490, 38 S.Ct. 383, 391, 392, 62 L.Ed. 831. The statute requires the Commission only to file a written report, stating its conclusions, together with its decision and order. This the Commission did, and the essential basis of its judgment is sufficiently disclosed in its report. Of course § 14(1) does not relieve the Commission of the duty to make the 'basic' or 'quasi-jurisdictional' findings essential to the statutory validity of an order. State of Florida v. United States, 282 U.S. 194, 215, 51 S.Ct. 119, 75 L.Ed. 291; United States v. Baltimore & Ohio R. Co., 293 U.S. 454, 464–465, 55 S.Ct. 268, 272–273, 79 L.Ed. 587. And the basic findings essential to the validity of a given order will vary with the statutory authority invoked and the context of the situation presented."

■■ We hold that the report of the Commission made findings which were sufficient to justify its ultimate conclusion that the rate under challenge should be allowed to stand. We do not think that the Commission's report should be found inadequate because it did not discuss the evidence in detail. It is true that the report does not specifically refer to all of the evidence offered by the plaintiffs (protestants) but it was not necessary that the Commission first refer at length to the protestants' evidence and then say why it did not accept it or why it gave greater weight to evidence opposed to it. If the findings expressed the Commission's essential factual conclusions, and such conclusions constitute the basis for the Commission's disposition of the matter before it, it impresses us that such findings are sufficient.

"Given that the report contains all essential findings required, c.f. State of Florida v. United States, 282 U.S. 194, 51 S.Ct. 119, 75 L.Ed. 291, the Commission is not compelled to annotate to each finding the evidence supporting it." United States v. Pierce Auto Freight Lines, 327 U.S. 515, 529, 66 S.Ct. 687, 695, 90 L.Ed. 821.

The Commission's report found that the new rate of $3.45 would provide a differential of 39 cents in favor of the all-water over barge-rail service. They recognized the necessity of maintaining such a differential in the respective water and rail service rates. The Commission discussed the revenue produced by the new rate and found that such a rate would be compensatory to the railroads. It discussed the contentions of the plaintiffs that the rate was so low that lake

carriers would be excluded from participation in the traffic, and that the establishment of the rate was an unfair and destructive competitive practice in violation of the national transportation policy. In this connection, it called attention to the fact that the largest user of sulphur at Detroit had indicated that with the new rate, its shipping requirements would be divided about equally between the all-water and barge-rail method of transportation. It apparently accepted such evidence as a fact relevant to the claim of the plaintiffs that they would be excluded from participation in the traffic.

The report reviewed the history of the competition between these various methods of transportation and the experience that these carriers had had while competing for this traffic. After reviewing much of the evidence, the report concludes:

"We find that the reduced rate is compensatory and no lower than necessary for the respondents to participate in the traffic. We conclude that the rate under investigation is just and reasonable."

We believe that such ultimate conclusions, after a review in its report of the factual background thereto, was an adequate finding upon the basic issue before the Commission.

█ It is not for this Court to start fresh to examine the entire record in this case to determine whether this Court would have arrived at the same conclusion as the Commission. We recognize the special function of the Interstate Commerce Commission and its expertness in the field of rate making and its awareness of the necessity of maintaining, in keeping with the national transportation policy, the various forms of transportation which participate in our national economy. We must recognize their judgment and skill in this field and in the absence of a convincing showing that they failed to take cognizance of and discharge their own responsibilities, we accept their findings. We do not retry the issues that were

before the Interstate Commerce Commission, but look only to see whether what they did was arbitrary, capricious, an abuse of discretion or not in accordance with law, or that the Commission exceeded its statutory jurisdiction and authority, violated some procedural requirement or was unsupported in its findings by substantial evidence (5 U.S. C.A. § 1009(e)). In taking this approach, we conform to what our courts have said should be our attitude in this respect.

"Unless in some specific respect there has been prejudicial departure from requirements of the law or abuse of the Commission's discretion, the reviewing court is without authority to intervene. It cannot substitute its own view concerning what should be done, whether with reference to competitive considerations or others, for the Commission's judgment upon matters committed to its determination, if that has support in the record and the applicable law." United States v. Pierce Auto Freight Lines, 327 U.S. 515, 536, 66 S.Ct. 687, 698, 90 L.Ed. 821.

Discussing the duty of courts to give weight to the expertness and special skill of the Interstate Commerce Commission, Justice Cardozo had this to say:

"The structure of a rate schedule calls in peculiar measure for the use of that enlightened judgment which the commission by training and experience is qualified to form. * * It is not the province of a court to absorb this function to itself. * * The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." Mississippi Valley Barge Line v. United States, 292 U.S. 282, 286, 287, 54 S.Ct. 692, 694, 78 L.Ed. 1260.

So many pronouncements of this rule of law have been made, that extended citations are unnecessary. We conclude this subject with the following quotation from Interstate Commerce Commission v.

Union Pacific R. Co., 222 U.S. 541, at page 547, 32 S.Ct. 108, at page 111, 56 L.Ed. 308:

"In determining these mixed questions of law and fact, the court confines itself to the ultimate question as to whether the Commission acted within its power. It will not consider the expediency or wisdom of the order, or whether, on like testimony, it would have made a similar ruling. 'The findings of the Commission are made by law prima facie true, and this court has ascribed to them the strength due to the judgments of a tribunal appointed by law and informed by experience.' Illinois Cent. R. Co. v. Interstate Commerce Commission, 206 U.S. 441, 27 S.Ct. 700, 51 L.Ed. 1128. Its conclusion, of course, is subject to review, but, when supported by evidence, is accepted as final; not that its decision, involving, as it does, so many and such vast public interests, can be supported by a mere scintilla of proof, but the courts will not examine the facts further than to determine whether there was a substantial evidence to sustain the order."

Special emphasis, however, is placed upon what the plaintiffs claim to be the failure of the Commission to consider and make appropriate findings on the question of whether or not the allowance of the rate under attack was in conformity with the national transportation policy. The national transportation policy reads as follows:

"It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions; all to the end of developing, coordinating and preserving a national transportation system by water, highway and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy." 49 U.S.C.A. Note preceding section 301.

It was the contention of the plaintiffs (as protestants before the Interstate Commerce Commission) that continuance of the rate under attack would result in unfair and destructive competitive practices in violation of the national transportation policy. With specific reference to the national defense, they offered evidence of the part that the Columbia Transportation Company played in World War II in the maintenance of an inland water route for the carriage of sulphur from Louisiana and Texas to users of sulphur in the New York harbor area. Because of this outstanding service rendered as a part of the national defense in war time, we assume their argument to be that to permit this rate to continue might be so injurious to the lake carriers as to make them unavailable to repeat in some future war the service that they rendered in World War II. We have read the testimony of their witness Cozzens in this regard and have summarized it earlier in this opinion. We have read also the brief filed by the plaintiffs as protestants at the hearing before the Interstate Commerce Commission. Aside from the recital of the facts of Columbia Transportation Company's contribution

to the war effort and their general claim of the competitive disadvantage that would flow from continuance of the rate under attack, we fail to find evidence supportive of the contention that the lake carriers in question would, or would be likely to be, put out of business by the rate in question. In this connection, it is significant to note that the proofs showed that in the years 1953 and 1954 the transportation of sulphur constituted 17.8 percent and 19.8 percent, respectively, of Columbia's total regulated traffic, and it was likewise shown that Columbia's regulated traffic constituted but 25 percent of its total traffic. The Commission in its findings was apparently satisfied from the testimony before it that the largest user of sulphur at Detroit would, with the new rate, divide its business about equally between water and rail transportation from Chicago. Assuming, therefore, that the Columbia Transportation would lose 50 percent of the business in sulphur traffic it had enjoyed in the year preceding the establishment of this rate, such loss would constitute approximately 2.225 percent of its total business. Columbia did not urge before the Commission, nor does it urge in its brief in this court, that such a loss of business would cause it to cease operation on the Great Lakes. In any event, all of its evidence that relates to this subject was before the Commission, and plaintiffs' contention that the reduced rate would constitute "an unfair and destructive competitive practice in violation of the national transportation policy" was specifically made and considered by the Commission. The Commission's report recognized this and averred, "they (protestants) urged that it (the reduced rate) constitutes an unfair and destructive competitive practice in violation of the national transportation policy". It is true that the above quotation is the only specific reference to the national transportation policy in the Commission's report. However, the test of whether or not the national defense would be impaired by continuance of this rate is whether or not it was likely to be de-

structive of competition. The Commission specifically found that it would not, and clearly indicated its consideration of the facts which had to do with whether or not the national defense would be effected, namely the destructive consequences of allowing the rate to stand. A fair review of the Commission's report demonstrates that it did consider this subject. The concluding paragraphs of the Commission's report are as follows:

"The protestant and supporting intervenor concede that the reduced rate is compensatory, but take the position that it is so low the water carriers would be excluded from participation in the traffic. They urge that it constitutes an unfair and destructive competitive practice in violation of the national transportation policy. No traffic moved under the reduced rail rate during the three months between the date when the rate became effective and the date of the hearing herein, and at that time no future movements had been scheduled. General Chemical's purchasing officer testified that traffic to Detroit would be divided about equally between the competing routes, with the preponderance moving all-water during the season of navigation, and barge-rail during the closed season. We find that the reduced rate is compensatory and no lower than necessary for the respondents to participate in the traffic.

"We conclude that the rate under investigation is just and reasonable. An order will be entered discontinuing the proceedings."

Certainly the above language constitutes the Commission's findings that the reduced rate would do no more than to allow the railroads to participate in the traffic, and would not be so destructive of competition as to violate the national transportation policy.

In the case of Luckenbach S.S. Co. v. United States, 122 F.Supp. 824, 827, 828, affirmed per curiam 347 U.S. 984, 74 S.Ct. 850, 98 L.Ed. 1120, the Court said:

" * * * it is clear that this expressed policy must serve as a guide to the Commission in all its decisions. * * * However it seems equally clear that the Commission cannot and should not be required to discuss each consideration expressed in the National Transportation Policy in every decision it renders. '[T]he basic findings essential to the validity of a given order will vary with the statutory authority invoked and the context of the situation presented.' Alabama Great Southern R. Co. v. United States, 340 U.S. 216, 288, 71 S.Ct. 264, 272, 95 L.Ed. 225. It is only necessary that the essential basis of the Commission's order appear in the report so that a court can satisfy itself that the Commission has performed its function. See Newtex S.S. Corp. v. United States, D.C., 107 F.Supp. 388, affirmed 344 U.S. 901, 73 S.Ct. 285, 97 L.Ed. 696; Capital Transit Co. v. United States, D.C., 97 F.Supp. 614, 621."

It is urged by the plaintiffs that the report neither accepts nor rejects the evidence which the plaintiffs offer concerning the service of the plaintiffs during World War II. Here again we do not think it necessary that the report specifically set forth that they considered certain evidence and did not consider it controlling. The evidence which was inadvertently omitted from the stenographer's transcript of the testimony, as discussed hereinabove, was clearly before the Commission and considered by them, notwithstanding its inadvertent omission. The brief of the protestants, filed before the Commission, made substantial recital of all of the facts which made up the substance of the omitted testimony. The contention of its relevancy to the subject of national defense was fully argued in protestant's brief. It was set forth in full in plaintiffs' petition for correction of the record and reconsideration of the matter. In disposing of the petition for reconsideration, the Commission stated, with reference to such omitted testimony, "It does not appear that the matter omitted from the transcript of testimony is such that it prejudiced the protestant water carriers."

To sustain their contention that the Commission's report did not contain adequate findings upon the matter of national defense, plaintiffs cite and discuss specifically Pacific Inland Tariff Bureau v. United States, D.C., 129 F.Supp. 472 and Cantlay & Tanzola, Inc., v. United States, D.C., 115 F.Supp. 72, 78. In both of these cases, the court annulled decisions of the Interstate Commerce Commission approving reduced rates established by rail carriers. We frankly state that were the facts of the case at bar, relevant to the national defense, as weighty and as indicative of a likelihood of impairment of national defense as were the facts in the mentioned cases, we might find it difficult to distinguish them from the case now before us.

It would unnecessarily prolong this opinion to make detailed review of the facts of the two cases in question. In the case of Cantlay & Tanzola, Inc., v. United States, supra, there was a dissent by five members of the Commission which indicated that the evidence before the Commission sustained their view that the rate approved was so low that certain common carrier tank-truck lines would by reason thereof be "unable to compete, and will go out of business * * *". The court in discussing the case summarized the attitude of the majority report by characterizing it as follows:

"It may well be wise, as the majority of the Commission have decided, to sanction a rate reduction purposed only to prevent a pipe-line carrier from entering the field; to approve rates which will probably result in enabling rail carriers to drive out tank-truck carriers from a given segment of transportation service; to do this on the theory that the rails will grow stronger through increased volume at rates which 'exceed the cost of rendering the service' and 'contribute something to fixed charges'; and thus

grown stronger be able to keep out the threatened invader." Cantlay & Tanzola, Inc., v. United States, D.C., 115 F.Supp. 72, 78.

In the case of Pacific Inland Tariff Bureau v. United States, supra, the facts very strongly evidenced a serious involvement of the matter of national defense and the court felt, and so held, that the Commission had not made findings which demonstrated that it had adequately considered the apparently serious involvement of national defense. In denying the petition for reconsideration and new trial (134 F.Supp. 210, at page 213) the Court said:

"Bluntly stated, we fear that the proposed railroad rates if approved will drive the barge lines out of business. This may not happen, but has the Commission considered this matter sufficiently to say that it will not happen?"

■ These quotations from the cases relied upon by the plaintiffs indicate that the facts thereof presented more serious and grave implications from the standpoint of national defense than does the case at bar. In this case, the Commission accepted the uncontested evidence that the largest consumer at Detroit would under the new rate likely divide its business about equally between rail and water carriage and as we have pointed out above, such being the fact, we do not think the record before us suggests the danger of destroying one means of transportation as was involved in the two cases relied upon by plaintiffs and discussed herein. No doubt the Commission might well have discussed this subject more fully than they did, but we are of the opinion that the report was adequate.

One other matter should, perhaps be discussed. Plaintiffs' brief alleges that the Commission committed error in stating in its report that "protestant and supporting intervenor concede that the reduced rate is compensatory." They argue that they did not concede that the reduced rate was compensatory. In their brief here, they quote from the brief filed before the Commission wherein they asserted that the rate was an unlawful and destructive practice, "even though it may be that such rate can be found reasonably compensatory". We think it of little importance whether the protestants did actually concede that the rate was compensatory. There was evidence that it was so, in fact, and plaintiffs do not contend that it was not. We find no reason to disturb the Commission's order because of this circumstance.

■ Other points are made by the plaintiffs which consist principally of arguments which might properly have been addressed to the examiner of the Interstate Commerce Commission and the Commission itself. We do not think it necessary to discuss these various points, satisfied as we are that there was substantial evidence to support the findings and conclusions of the Commission.

We affirm the decision of the Commission and an appropriate Order in conformance with this Opinion may be presented.